HENRY G. DAVIS & Co., and THE NATIONAL BANK
OF PIEDMONT *vs.* THOMAS GEMMELL, and others.
THOMAS GEMMELL and MALCOLM SINCLAIR *vs.* JOHN
P. POE, WILLIAM WALSH, and JOHN M. CARTER.
WILLIAM A. BRYDON, and others *vs.* THOMAS GEM-
MELL, and others.　THE NORTH BRANCH COMPANY
*vs.* THOMAS GEMMELL, and others.

*Corporation—Minority stockholders — Limitations — Counsel
— Contingent fee— Creditors—Final order—Appeal.*

Where a bill is filed by the minority stockholders of a corporation
to prevent an asset belonging to the corporation, from being ap-
propriated by a stockholder owning a majority of the stock, to
his own use, and the Court holds that such asset—a judgment—
though recovered in the name of the majority stockholder, is in
fact the property of the corporation. it is proper for the Court,
on the further request of the complainants, to direct a distribu-
tion of the funds among the parties entitled thereto.

A stockholder cannot interpose the plea of limitations to the claim
of a creditor preferred directly against the corporation, when the
corporation is itself a party to the cause, and declines to make
such defence.

A stockholder is not, as stockholder, a creditor of the corporation
whose stock he owns.　He has no standing in a Court of equity
apart from the corporation of which he is a member, except
when he appeals to that Court to prevent the majority from doing
some act which is *ultra vires*, or from making some fraudulent
disposition of the corporate property.

Counsel employed by a majority stockholder to prosecute a claim,
upon a contingent fee,—an agreed percentage of the amount
which might be recovered—they supposing that such claim be-
longed to him individually, will be allowed their fees out of the
fund realized by their labors, as against the minority stockhold-
ers, who stood by and saw the work done, and neither interfered
nor objected.

Davis, Brydon, *et al. vs.* Gemmell, *et al.*

The persons who advanced money to the majority stockholder to enable him to recover, in his own name and for his own use, as well as theirs, a judgment which properly belonged to the corporation, and did this with knowledge that the corporation was being thereby deprived of its property, will not be allowed reimbursement out of the fruits of the judgment.

The majority stockholder bought certain coal land, and took the deed in his own name; and a mortgage for unpaid purchase money was executed by him. The property was bought for the use of the corporation, and was afterwards conveyed to it with the lien of the mortgage thereon. In a litigation that was had, it was decreed that the amount due on the mortgage should be paid to the mortgagees, and upon such payment being made the mortgage and mortgage notes should be cancelled. HELD:

That the persons who, to prevent a sale of the property, paid the amount due the mortgagees under the decree, and took an assignment of the decree for their security, were entitled to have such amount paid to them out of the proceeds of the judgment.

A claim for money paid for taxes on the property of the corporation, for which no vouchers or receipts from the tax collectors were produced, nor a copy of the assessed valuation of the property was filed, will not be allowed.

To the accounts of the auditor distributing the judgment, many exceptions were filed by all parties in interest, and after a hearing the Court rejected all the accounts, and referred the papers back to have a new account stated in conformity to the opinion then filed In that opinion many of the claims in controversy were declared by the Court not entitled to be allowed, but the only order passed was the one referring the case back to the auditor to state a new account. Subsequently the auditor stated an Account D, in accordance with the views expressed in the opinion of the Court, and an Account E at the instance of some of the claimants. Exceptions were filed to both accounts. The Court overruled the exceptions to Account D, and finally ratified it, and in the same order rejected Account E. HELD:

That this order formally disposing of the claims was the final order, and the time within which an appeal must be taken, should be computed from its date.

APPEALS from the Circuit Court of Baltimore City.

---

Davis, Brydon, *et al. vs.* Gemmell, *et al.*

---

The case is stated in the opinion of the Court.

The cause was argued before ALVEY, C. J., MILLER, ROBINSON, IRVING, BRYAN, FOWLER, McSHERRY, and BRISCOE, J.

*John Prentiss Poe*, for William A. Brydon and others.

*Wm. Pinkney Whyte*, *Attorney-General*, for Davis & Co., and the National Bank of Piedmont.

*Wm. L. Marbury*, and *W. Irvine Cross*, for Gemmell and Sinclair.

*J. Southgate Lemon*, by leave of Court, filed a brief on behalf of the Hampshire and Baltimore Coal Company.

McSHERRY, J., delivered the opinion of the Court.

William A. Brydon recovered a judgment amounting to seventy-five thousand dollars against the Baltimore and ·Ohio Railroad Company for a breach of contract with respect to the purchase of coal from him by the railroad company. This judgment was entered to the use of Henry G. Davis and Company. Upon appeal to this Court by the railroad company, the rulings upon which the judgment was founded were sustained and the judgment itself was affirmed. 65 *Md.*, 198. Immediately thereafter Thomas Gemmell and Malcolm Sinclair filed a bill in the Circuit Court of Baltimore City against Henry G. Davis and Company, William A. Brydon, the North Branch Company, and the Baltimore and Ohio Railroad Company. The bill alleged that the judgment, though recovered in the name of Brydon, in fact belonged to the North Branch Company, of which Brydon, Gemmell and Sinclair were stockholders—Brydon owning a majority of the stock, and Gemmell and Sinclair the remainder,

and that the assignment of the judgment to Davis and Company was fraudulent. It prayed that a receiver of the North Branch Company might be appointed to take charge of all the property and assets of that corporation; that the assignment of the judgment to Davis and Company might be cancelled; and that the Baltimore and Ohio Railroad Company might be restrained from paying over the amount of the judgment to Brydon or Davis and Company. An injunction issued as prayed. The defendants answered the bill, Brydon claiming that the judgment did not belong to the North Branch Company, and Davis and Company claiming that it was their property under the assignment from Brydon. A motion was made to dissolve the injunction, and a large mass of testimony was taken. In the meantime the Baltimore and Ohio Railroad Company was required to and did bring into Court the greater portion of the amount due on the judgment. The motion to dissolve was, after hearing, denied, and an appeal brought the case into this Court, where the ruling was affirmed, and the cause was then remanded. *Davis & Co. vs. Gemmell & Sinclair,* 70 *Md.,* 356. When the case again reached the Circuit Court an amended bill was filed, praying the following relief in amplification of that prayed for in the original bill, viz., that a decree might be passed, 1st. Adjudging and decreeing that the said North Branch Company be wound up, its property sold, and its assets collected and distributed among the parties entitled thereto. 2nd. That an account be taken of the assets and liabilities of said company. 3rd. That in order to carry out such winding up, sale and distribution, a receiver be appointed, with full power and authority to take possession of all the property, books, papers and accounts of the company, and to sue for and recover all moneys due the company. 4th. That Brydon and all others claiming to be officers of the company turn over

to the receiver all the property and books of the company, and that the receiver give notice to all creditors to file their claims. 5th. That a preliminary receiver be appointed. Answers were filed denying the right of the Court to wind up the company, but assenting to a distribution of the fund. Testimony was taken, and on the 28th of September, 1889, a final decree was passed, declaring that the seventy-five thousand dollar judgment was the property of the North Branch Company, making the injunction perpetual, and referring the cause to the auditor "to state an account or accounts distributing *the amount of the judgment with interest thereon,* upon the pleadings and proof now in the cause, and such other testimony as may be produced by any of the parties, or by any parties who may file claims as creditors, to and amongst the several parties who may be entitled thereto." It was further ordered that notice be given to creditors of the North Branch Company to file their claims. A number of claims were filed, and much testimony was taken before the auditor, who thereupon stated three accounts, to which exceptions were filed; whereupon the Court rejected all the accounts, and sent the papers back to the auditor, with instructions to state another account on the principle upon which account A was founded. This the auditor did, and his report is marked account D. To this account exceptions were also filed, but they were overruled and the account was ratified, and from the final order of ratification these four appeals have been taken.

The original bill filed by Gemmell and Sinclair was filed by them as minority stockholders, to prevent an asset—the seventy-five-thousand-dollar judgment—belonging to the North Branch Company from being appropriated by Brydon to his own use; and this Court sustained the right of a minority stockholder to intervene and invoke the aid of a Court of equity to prevent

the fraudulent diversion of the property of the corporation by the majority stockholder. After a patient and thorough examination of the voluminous record in that case this Court further held, in a carefully prepared and exhaustive opinion, that the judgment, though recovered in Brydon's name, belonged in fact to the North Branch Company—a body corporate located in Garrett County—and that Henry G. Davis and Company were not *bona fide* assignees of that judgment. The effect of that decision was to strike down the assignment of the judgment to Davis and Company, and to declare the judgment the property of the North Branch Company. Ordinarily—no other facts appearing to render further proceedings necessary—the cause would then have been at an end, and the North Branch Company would have been absolutely entitled to demand and receive the money due on the judgment. But as Brydon owned the majority of the stock, to have placed the funds in the hands of the company would have been practically putting them in his own possession, and under his own control; and hence the supplemental bill of complaint was filed asking for the appointment of a receiver. In answering this bill Brydon, Davis and Company and the North Branch Company consented that the funds should be distributed in the Circuit Court under the proceedings then pending, though they vigorously resisted the appointment of a receiver and the winding up of the corporation.

It is perfectly clear that the Circuit Court of Baltimore City had no authority to wind up and dissolve the North Branch Company. That company was located in Garrett County, and was not within the jurisdiction of the Court, which was asked by the amended bill to declare its dissolution. *Code, Art.* 23, *sec.* 264. The Court below, therefore, very properly refrained from passing such a decree. It also refrained from appointing

a receiver, and merely sent the case to the auditor to state an account "distributing *the amount of the judgment with interest thereon.*" But the auditor pursued an entirely different principle in stating the accounts, and the Court subsequently approved it by ratifying audit D. Instead of merely following the terms of the decree, and making distribution of the judgment and interest which together amounted to ninety-three thousand, three hundred and thirty-four dollars, and eighty-seven cents, the auditor, under the instructions of the appellees' solicitors, added alleged items of indebtedness due by Brydon to the North Branch Company, and thereby swelled the total amount to one hundred and ninety thousand, sixty-four dollars and thirty-two cents, and then actually confiscated Brydon's whole stock in the company to pay this confessedly only estimated indebtedness. This went far beyond the terms of the decree, and resulted practically in winding up the affairs of the company by an indirect proceeding, when the Court was utterly powerless to accomplish the same result upon a direct proceeding. The theory of the account was radically wrong, apart from the errors arising out of the disallowance of several claims, which should have been ordered to be paid.

To many of the claims filed by creditors of the North Branch Company, Gemmell and Sinclair interposed the plea of limitations, and this gives rise to the question whether a stockholder can plead this or any other plea as a defence to the claim of a creditor preferred directly against the corporation, when the corporation is itself a party to the cause, and does not make or wish to make defence. We have been referred to, and we have found, no case where such a doctrine has been sanctioned. A stockholder is not, *as stockholder*, a creditor of the corporation whose stock he owns. He has no standing in a Court of equity, apart from the corporation of which he is a member, except when he appeals to the Court to

prevent the majority from doing some act which is *ultra vires*, or from making some fraudulent disposition of the corporate property. In such cases he in fact merely sets in motion the necessary legal machinery for the protection of the body corporate itself. But here the purpose is to defeat the payment of claims apparently valid, not that the funds may be paid over to the corporation, but that Gemmell and Sinclair may receive, *as stockholders*, a larger dividend on their stock out of the funds in Court. It would lead to many serious complications in the administration of justice if a perfectly honest claim, due by a corporation, could, because barred by the Statute of Limitations, be defeated upon the objection of a minority stockholder, notwithstanding the corporation made no objection to the payment of the claim, and actually recognized its validity. If it be competent for minority stockholders to rely successfully upon that plea, then logically a single stockholder, owning but one share out of many hundreds, may do the same thing. One who has the right to rely on the Statute of Limitations by way of defence has, of necessity, the right to waive the bar by making a new promise, or by recognizing the debt as a subsisting one because the one right is merely the correlative of the other. Consequently, some other stockholder, possessing the same right to make the defence as the one who did, could destroy the value of that defence by making a new promise or recognizing the debt. But no recognition of a debt, or even express promise by a stockholder, in behalf of the corporation, can possibly bind the latter. The mere fact that he is a stockholder does not make him an agent to contract for the body corporate or to bind it by his acts. *Morelock vs. Westminster Water Co.*, 65 *Md.*, XIV of "*Opinions Unreported;*" 4 *Atlantic Rep.*, 404. If he does not possess the one power, how can he possess the other, when they are essentially inseparable? The rights of

the stockholder are all subordinate to the rights of the corporation's creditors. The stockholders are entitled to none of the company's assets or property until all just debts due by the corporation are paid; and the fact that a claim is over three years standing is no evidence that it is unjust or without merit, particularly when the delay in asserting it has resulted from a long and warmly contested litigation, that ultimately produced the fund out of which the payment must be made, if made at all. The stockholder does not stand on an equal footing with a creditor, and is not jointly entitled with him to the fund. His claim to it begins only after every creditor has been satisfied. If the fund be insufficient to pay all creditors in full, the stockholder is not entitled to share that fund with them. There is no analogy between the relation of a stockholder to such a fund as we have here, and that of a creditor of the company to which the fund belongs. The right of minority stockholders to intervene and prevent fraud, is quite different from the right to assume the functions of the corporation, and to perform affirmative corporate acts; and therefore, in *Bronson and Souter vs. La Crosse and Milw. Railroad Co ,* *et al.,* 2 *Wall.,* 283, whilst the right of a stockholder to intervene in a proper case was fully recognized by the Supreme Court, it was distinctly held that when stockholders, not made defendants by the bill, were permitted, by leave of the Court, to appear and put in answers in the name of the company defendant, such answers could not be regarded as the answers of the corporate body, but might be regarded as those of the individual stockholder. But, by pleading the Statute of Limitations, Gemmell and Sinclair are not seeking to restrain the majority stockholder from doing any fraudulent act with respect to the property of the company, nor are they endeavoring to prevent the company itself from doing something *ultra vires;* but they are making an inde-

Davis, Brydon, *et al. vs.* Gemmell, *et al.*

pendent defence in behalf of themselves, as stockholders, against the claims of third parties preferred, not against Gemmell and Sinclair, but against the corporation of which they are not the agents or authorized representatives.    The company, or some one representing the company, such as a receiver, alone can resort to this plea in behalf of the corporation.    Had the Court below appointed a receiver, that officer would have been clothed with full power to interpose the defence of limitations or any other defence, which in his judgment the justice and equity of the case required.    In such a case as this the defence of limitations may be interposed only by the debtor company.    Gemmell and Sinclair are confessedly not creditors of the North Branch Company, and they are not, in fact, as creditors relying on the Statute of Limitations, even if they could as creditors make that defence.    The company itself in its corporate capacity and by its proper officers has not put in that plea, and these two stockholders have no power to plead it for the company.    We therefore hold they have no authority to plead it at all.

This brings us to the consideration of the several claims which are contested, and we shall dispose of them separately, though briefly.

1. Messrs. Walsh, Poe and Carter, the counsel who successfully conducted the litigation in the name of Brydon, against the Baltimore and Ohio Railroad Company, claim to be paid out of the fund realized by their labors.    Gemmell and Sinclair object to this.    Brydon was without means to carry on the suit, and he employed these eminent counsel upon a contingent fee,—a certain and agreed percentage of the amount which might be recovered.    Gemmell and Sinclair evidently knew this, for they undoubtedly knew that Brydon was utterly unable to compensate these gentlemen.    Gemmell and Sinclair never objected during the progress of the trials— for the case was tried once in Howard County, then in

Baltimore City, and finally on appeal in this Court. But
for the labors of these counsel no fund would now be in
Court as the result of that litigation. They acted in
the most absolute good faith throughout the whole con-
troversy. It is palpably inequitable, after the labor has
been performed and the result has been achieved, that
Gemmell and Sinclair should be allowed to absorb that
portion of the fund, which, under Brydon's contract with
his counsel, justly and honestly belongs to the latter.
Gemmell and Sinclair stood by and saw the work done;—
they neither interfered nor objected;—and they cannot
now be heard in a Court of equity to except to that work
being paid for out of the fund realized by the labor of
these gentlemen, especially when they themselves, these
exceptants, are seeking to reap the benefit of that very
work and labor. We think the Court below was clearly
right in allowing these fees as a preferred claim.

2. With regard to the fees of Messrs. Cross and Mar-
bury, a somewhat similar principle is applicable, though
we are unable, after many consultations, to agree with
the Judge of the Circuit Court as to the amount to which
these gentlemen are entitled. Their labor resulted in
preserving the fund for the North Branch Company, and
whilst those labors were exacting, and most skillfully
and ably performed, we think that the amount allowed
therefor in the auditor's report is something too large.
After mature consideration we have reached the conclu-
sion that the sum which should be audited to them upon
a *quantum meruit* is fourteen thousand dollars. This is
also a preferred claim upon the fund in Court. We
must, therefore, reduce the amount from twenty to four-
teen thousand dollars.

3. The Court below refused to allow the claim of
Henry G. Davis and Company, amounting to five thou-
sand, seven hundred and seventy-nine dollars and sixty-
eight cents. This claim is made up of sums advanced

by Henry G. Davis and Company to Brydon to enable
the latter to carry on the suit against the railroad com-
pany.    Upon first blush it seems equitable and just that
this claim should be paid;—that those who advanced the
money required to carry on the suit which resulted in
producing the fund in Court ought to be reimbursed out
of that fund what was thus expended by them.    We
have endeavored in vain to discover some tenable ground
upon which to base its allowance, but there are well
settled and firmly established principles of the law which
absolutely preclude its payment, under the circumstances
disclosed by the records.    In support of this claim we
have been referred to the case of *Williams vs. Gibbes, et
al.,* 20 *How.,* 535.    But that case is widely different
from this.    It appeared there that the insolvent trustee
of James Williams sold to Robert Oliver the interest of
Williams in a company known as the "Mexican Com-
pany of Baltimore."   That company had a claim against
the Mexican government.    Mr. Oliver after his purchase
from the trustee of Williams, prosecuted the claim, and
after many years secured its allowance under the treaty
of 1839 with Mexico.    Both Williams and Oliver died.
By a decision of the Court of Appeals, rendered at the
June Term, 1849, it was discovered that Mr. Oliver, in
fact, acquired no title from the insolvent trustee, and
that, therefore, the fund finally realized, belonged not to
Oliver's estate, but to the estate of Williams.    There-
upon the executors of Robert Oliver claimed that their
testator's estate should be reimbursed out of the fund
the expenses incurred in collecting it, and should also
be allowed a reasonable compensation for the services of
the testator in prosecuting the claim to a successful
issue.    This demand the administrator of Williams re-
sisted, but the Supreme Court allowed both claims upon
the ground that Mr. Oliver had acted throughout in the
honest belief that he was the *bona fide* owner of Williams'

interest, and that, therefore, when the labor had been done and the money had been secured, equity required that his estate should be reimbursed his expenses, and compensated for his services out of the fund realized thereby, even as against the true owner of the property —that the real owner could not claim the fund without compensating Oliver's estate, upon the principle that he who seeks equity must do equity. This doctrine was applied because there was no pretence that Mr. Oliver ever suspected, or had reason to suspect that he was not the real and *bona fide* owner of the interest of Williams.

Had Messrs. Davis and Company made advances to Brydon under the belief that Brydon was the owner of the mines, or was entitled by contract with the North Branch Company, in consideration of a royalty to be paid by him to it, to mine coal for his own use, or for sale on his own account, then there can be no question that they would have been allowed the amounts advanced, even though it was subsequently developed that the proceeds of the judgment actually belonged to the North Branch Company, and not to Brydon. This is, in fact, the very position taken by the Messrs. Davis and Company in their answer to the original bill; but this Court, in reviewing, on the former appeal, the order refusing to dissolve the injunction, decided that from the proof then in the record these gentlemen had sufficient information to put them on inquiry with regard to Brydon's relations with and Gemmell's interest in the North Branch Company. And, we said, if in the face of the facts then before us, Messrs. Davis and Company "saw fit to advance money to Brydon on the faith of his statements in regard to this contract, and in regard to Gemmell's rights as a stockholder, they did so with their eyes open, and took upon themselves the risk of Brydon's statements turning out to be true." This was a distinct decision that Messrs. Davis and Company possessed actual

knowledge, or means of knowledge respecting the rights of the North Branch Company and its stockholders to the contract with the railroad company when the money they now claim was advanced by them to Brydon.   It is true, this determination was not necessarily final, because it was made upon consideration of a motion to dissolve an injunction.   It was open to be qualified, or absolutely reversed upon final hearing, if additional evidence had been adduced, establishing different facts from those upon which the preliminary decision was founded. But upon this subject not a particle of new proof has been adduced.   Neither Senator Davis nor his brother was called as a witness, and consequently neither has given any explanation of the facts bearing on this branch of the inquiry.   If we were to decide upon mere conjectures, it is possible that an explanation could have been given by Davis and Company; but as we are dealing judicially with the question, we are precluded from considering anything but that which is in the record.   As nothing has been adduced to cause a modification of the opinion expressed in 70 *Md.*, 356, the result there announced must stand, and standing, it is an insuperable obstacle to the allowance of this claim.   In effect it holds that Messrs. Davis and Company made under the agreements between them and Brydon, dated December 4th, 1877, and April 2d, 1879, advances to Brydon to enable him to recover in his own name and for his own use, as well as theirs, a judgment which properly belonged to the North Branch Company, and that they did this with knowledge that the North Branch Company was being thereby deprived of its property.   Assuming this to be so, we are confronted with a rule of law which is of universal operation, " that none shall by the aid of a Court of justice obtain the fruits of an unlawful bargain." ·*Russell vs. DeGrand*, 15 *Mass.*, 35; *Gibbs vs. Baltimore Gas Co.*, 130 *U. S.*, 396.

4. The claim known as the Gouverneur lien was also disallowed by the Court below. The character of this lien is shown in the case of *Brydon vs. Campbell and Gouverneur*, 40 *Md.*, 331. Brydon bought certain real estate from Gouverneur, which Gemmell testified was bought on his and Brydon's joint account. The deed was made to Brydon alone, and a mortgage for unpaid purchase money was executed by him. Upon this property are located the very mines out of which the coal was mined, under Brydon's contract with the railroad company. The property was bought for the use of the Savage and North Branch Company, and was afterwards conveyed to the North Branch Company with the lien of the mortgage upon it. The case referred to in 40 *Md.*, 331, resulted in a decree against Brydon requiring him to pay to the two claimants the amount due on the mortgage, and directing that upon such payment being made, the mortgage and mortgage notes should be cancelled. To prevent a sale of the property, Davis and Company paid to the Gouverneurs the amounts due to them under the decree, and took an assignment of that decree for their security? They have held the lien, and not enforced it, but now ask that it be paid out of the fund in Court. Gemmell and Sinclair now object, though on July 21st, 1874, Gemmell in writing to Brydon, distinctly recognized the validity of this claim, when he said "all earnings of the company must be devoted from month to month primarily to the payment of wages and bills, and next *to the liquidation of the Gouverneur indebtedness, &c.*" It is not pretended that this lien has been paid. In our opinion it is entitled to be paid out of the proceeds of the judgment. The claim allowed is the Gouverneur lien evidenced by the decree assigned to Henry G. Davis and Company. The amount which Davis and Company are entitled to be paid out of the funds of the North Branch Company in satisfaction of that lien is the face of the

decree with interest from the date of the decree. We have treated Davis and Company as the owners of the lien under the absolute assignment of it to them, and the testimony of Brydon that they hold it merely as collateral security is not sufficient to change the character of the written transfer.

5. The Hampshire and Baltimore Coal Company's mortgage for eight thousand, one hundred and sixty-one dollars and fifty cents, allowed in auditor's report D, is entitled also to be paid in full. It is not disputed.

6. The balance due to Henry G. Davis and Company on a three thousand dollar mortgage from the North Branch Company, dated May 1st, 1875, and now amounting, after deducting credits, to three thousand, five hundred and thirty-six dollars and thirty-two cents, was allowed in audit D, and is clearly entitled to be paid in full.

7. The claim of the National Bank of Piedmont for advances (and interest thereon) made by it for the purpose of enabling Brydon to carry on the suit against the Baltimore and Ohio Railroad Company was not allowed in audit D. This claim amounts to three thousand, two hundred and forty-six dollars and fifty-eight cents, and is inserted in auditor's account E, as a preferred claim. But the claim is not supported by sufficient evidence, and we cannot, therefore, allow it. Brydon is the only witness who is produced to sustain it. The bank itself furnished no evidence to uphold it.

8. We think that there was no error in rejecting two other claims of the National Bank of Piedmont; one for $2,284.37, and the other for $8,557.11. These claims are founded on promissory notes of Brydon's, which were discounted by the bank. They are all, except one, signed by him individually, and the excepted one is signed by him as president of the North Branch Company, but it, as well as the others, was evidently given for

Brydon's own indebtedness. It is true, he testifies that the funds were used for the North Branch Company, but the conclusive evidence against the right of the bank to be paid out of these funds is furnished by a mortgage dated December 10th, 1875, and executed by Brydon and wife, conveying her own property to the bank to secure the payment of these very identical notes, and distinctly reciting that they were "discounted by the said bank for *the benefit and use of said William A. Brydon."* In the face of this explicit declaration it is impossible to treat the amounts due on these notes as debts of the North Branch Company. That the bank did not regard these notes as representing a debt due to it by the North Branch Company is perfectly evident from the testimony of cashier McCandlish, to be found in the former record. He testified that these very notes were discounted for Brydon; that the North Branch Company had no credit with the bank; and that the bank "relied upon the strength and the name of William A. Brydon mainly." As between the bank and Brydon, Brydon was the debtor, and was so regarded by both parties to the notes. It is too late now to shift the responsibility from Brydon, and to fasten it on the North Branch Company.

9. The Court was also right in not allowing the sum of one thousand, three hundred and fifty-nine dollars and fifty-six cents, alleged to have been paid by H. G. Davis and Company for taxes due for the years 1884, 1885, 1886 and 1887, on the North Branch Company's property. This claim is not properly authenticated. A mere memorandum has been filed and testified to by Brydon, but no vouchers or receipts from the tax collectors were produced, and not even was a copy of the assessed valuation of the property filed. If Messrs. Davis and Company really paid these taxes they could easily have produced some evidence of the fact in addition to the unsupported statement of Brydon. No member of the firm was called

to prove the payment. The absence of such testimony is, in itself, sufficient to throw great suspicion upon the claim. The proof does not justify the allowance of this demand, and for that reason it is rejected.

10. The claims of E. R. Brydon, P. S. Hyde and Dr. E. H. Parsons were properly disallowed. The claim of Edward R. Brydon is for salary as superintendent of the North Branch mines from August the 1st, 1875, to December 31st, 1876, at $125.00 per month, with interest. Now, according to the testimony of Edward Brydon himself, to be found in the record on the former appeal, he was only entitled to seventy-five dollars per month as superintendent. The North Branch mine closed operations entirely on the 6th of May, 1876, when the railroad company ceased to receive the coal. Consequently for the period the mine was worked from August 1st, 1875, to May, 1876, allowing Edward Brydon the price fixed in his own testimony, the aggregate amount of salary due, without interest, would be only $675.00, instead of .$2,125.00, without interest. It is quite apparent from the records that Edward Brydon was, during the period covered by his claim, in necessitous circumstances, and he could scarcely have afforded to work continuously for seventeen months without receiving a single dollar of compensation. This renders it highly probable that payments were made him, and that circumstance, coupled with the unexplained increase from seventy-five to one hundred and twenty-five dollars per month, throws discredit upon the whole claim. We are not left to conjecture on the subject of payments having been made to Edward R. Brydon. In the account filed by William Klipstein against the North Branch Company, it appears that for the month of October, 1875, Edward Brydon received from Klipstein's store, on the credit of the company, $40.30; for the month of November, $43.33; and for the month of December, $19.55. It further appears,

that in January or February, 1876, E. R. Brydon gave his note to one Atkinson for $191.34. This note was indorsed by the North Branch Company, and was given in settlement of Atkinson's acccount against E. R. Brydon for merchandise furnished him. E. R. Brydon was superintendent of the mines at that time; the company was in debt to him; "and for this reason," says Wm. A. Brydon, "the company endorsed his notes to Atkinson." Upon this and other notes, Atkinson sued the company, and recovered a judgment. No credits have been given for these items of payment, and no explanation has been offered for the omission.

The claim of P. S. Hyde for expenses incurred in developing the four foot seam, and in paying witnesses' expenses to Howard County and Baltimore City upon the trials against the Baltimore and Ohio Railroad Company, is not satisfactorily proven, and was therefore properly rejected.

The claim of Dr. Parsons rests on one note of Wm. A. Brydon, president of the North Branch Company, and one individual note of Brydon. Dr. Parsons was the physician who attended the miners. Brydon deducted from the men's wages the sums they owed the Doctor, but instead of paying these sums over, he gave the note of the company. This is the mode in which the first note was made up. It is hardly necessary to say that this note does not constitute a debt of the company, which the fund in Court can be drawn on to pay. The second note is alleged to have been given for money loaned Brydon by Dr. Parsons for the use of the North Branch Company, between January and July, 1875. We are not satisfied by the proof, in view of all the surrounding circumstances, that this is a debt of the company. Why Brydon should have been borrowing money then for the use of the company, when just at that time the company was receiving large amounts from the railroad

company, is not explained; and we must treat the claim, according to the face of the note, as Brydon's, and not the company's debt.

11. The claims numbered 8, 9, 13, 14, 15, 16, 17, 19 and 22 in the "apportionment of balance to claims" in audit E, are allowed in both audits D and E, and there have been no sufficient reasons assigned to induce us to question their accuracy. The claim of Atkinson & Co., in audit D, for $2,250.88, has not been excepted to, and is not open to examination. But we think it sufficiently established.

12. The claim of Dr. Shuey is similar to that of Dr. Parsons, already considered, and for the reasons we have given in rejecting that, this must also be disallowed.

13. The claims of Wm. E. Cromwell, John T. Dixon, E. G. Fredlock, and William Klipstein, for small amounts, seem to be due by the North Branch Company, and ought to be allowed.

14. The remaining claims are those of William A. Brydon and his wife, Mrs. Susie V. Brydon. The claim of the latter is based on a note of the North Branch Company dated July 6th, 1875, payable to William A. Brydon for $10,591.35, and assigned by him to his wife. And the claim of Brydon himself is for sums alleged to have become due to him by the company after the date of the note just alluded to. We cannot question the entire correctness and truth of the consideration which supports the assignment of the note by Brydon to his wife. The record is full and explicit upon this point. He received from the executors of his wife's father's estate, on account of her interest therein, considerable sums of money, and gave his own obligations therefor, and when he obtained the note of the North Branch Company he assigned it to his wife in exchange for those obligations, and as a payment to her of the money belonging to her and received by him from her father's

estate.   If the question rested here, we should have no
difficulty in sustaining Mrs. Brydon's claim; but there
is an inquiry back of and beyond this, and that is, did
the North Branch Company really owe Brydon that or
any other sum of money when the note was given?  This
question is attempted to be answered by referring to
and relying on the minutes of a meeting of the board
of directors and a meeting of the stockholders of the
North Branch Company.   Both of these meetings were
held on the 6th of July, 1875.   Upon an examination
of these minutes it will be found that practically all
that was done at both meetings was done by Brydon
himself.   There were five hundred and two of the one
thousand shares of the capital stock represented at the
stockholders' meeting.   E. R. Brydon was president of
the meeting, and appointed W. A. Brydon inspector,
who reported five hundred and two shares present.   He
further reported that he, his brother E. R. Brydon, his
brother-in-law John C. Brady, Thomas E. Owens, for-
merly a clerk in Brydon's store, and Thos. Gemmell were
elected directors.   Gemmell, who owned 497 shares of the
stock, was not present. So Brydon, his brother, his brother-
in-law, and his former clerk, referred the claim of Bry-
don against the company to the next meeting of the
directors; and that meeting, which was held the same
day, was composed of the same four individuals.   They
then passed, as a board of directors, the resolution in-
structing the secretary to execute the note in question,
though they did not have before them the slightest evi-
dence as to the correctness of Brydon's claim or the
verity of its items.   Brydon himself was the controlling
influence.   He presented the claim, he certified to its
accuracy, and on the same day procured an order to be
passed for the execution of the note.   On the former
appeal (70 *Md.*, 374,) this Court had occasion to deal
with another proceeding of the same board of directors,

and to characterise that proceeding "as a plain breach of trust on their part, and in fraud of the rights of the stockholders." We are driven to believe that the matter now being considered is of precisely the same nature. It was merely the *ex parte* act of Brydon, who, despite the large sums of money—something over forty thousand dollars, according to the manifest book—which he had received up to that time from the Baltimore and Ohio Railroad Company for coal delivered to it from the North Branch mine, preferred this claim founded upon an alleged excess of expenditures over receipts. Gemmell, as we have said, was not present and does not appear to have had notice of what took place; and the whole transaction bears upon its face such unmistakable indications of bad faith that it must be discredited, notwithstanding the plausible attempts of Brydon in his testimony, and by his subsequently formulated accounts, to sustain and uphold it. Without going into particulars, which we cannot do except by extending this opinion to a most unreasonable length, it may be stated, as the result of a minute examination of the records in this and the former appeal, that there are so many discrepancies and instances of contradiction (in matters of small moment in most instances, it is true) that little credit can be safely given to the accounts rendered by Brydon in his own behalf; and we, consequently, feel a decided reluctance to accept them, however plausible, unless they are fortified by other evidence or by probabilities or presumptions of their accuracy. There is, to state it mildly, a degree of improbability pervading these personal claims of Brydon, which it is simply impossible to ignore, and diligent search and patient scrutiny of the records have failed to convince us that there is sufficient confirmatory evidence to entitle them to be allowed. They must therefore be rejected.

We have now disposed of all the claims before us, and we have indicated those which, in our opinion, ought to

be allowed, and also those which must be rejected. By the payment in full of all those which are entitled to be paid the whole fund will not be absorbed. The balance, after deducting the costs of these appeals, belongs to the stockholders of the North Branch Company, and must be audited to them ratably according to their respective holdings of the stock of the company.

Finally, we come to the motions to dismiss the appeals. A discussion of them has been deferred till now with a view to avoid repetitions in this opinion. The ground of the motions is that the appeals were not taken in time. When the auditor stated his accounts A, B and C under the decree of September 28th, 1889, many exceptions were filed by all parties in interest, and after a hearing the Court rejected all the auditor's reports on July 10th, 1890, and again referred the papers back to have a new account stated in conformity to the opinion then filed. In that *opinion* many of the claims now in controversy were declared by the Court not entitled to be allowed, but the only *order* passed was the one referring the case back to the auditor to state a new account in accordance with the views expressed in the opinion. On August 6th, 1890, account D, stated under the opinion of July 10th. was filed; and on August 15th account E, stated at the instance of Brydon's and Davis and Company's solicitors, was also filed. Account D did not allow the claims rejected in the opinion of July 10th, but account E did. Exceptions were filed by the appellants to account D, and by the appellees to account E, and on August 20th the Court overruled the exceptions to account D, and finally ratified it, and in the same order rejected account E. All the pending appeals were taken within sixty days after the date of this last order ; and as that order is the final order, and in fact the only *order* or *decree*, formally disposing of the claims, the appeals are properly before us.

Davis, Brydon, *et al. vs.* Gemmell, *et al.*

It results from the views we have expressed that the order appealed from will be affirmed in part and reversed in part, and the case will be remanded, that a new audit may be stated distributing the fund in conformity to this opinion, without additional evidence being taken; the costs to be paid out of that fund. We have ordered the costs to be paid out of the fund because thereby they will be borne ratably by Brydon, Gemmell and Sinclair, each of whom has actively prosecuted one or other of these appeals, and each of whose contentions has, to a greater or less extent, been unsuccessful.

> *Order affirmed in part, and reversed in part, and cause remanded for further proceedings, in conformity to this opinion, costs to be paid out of the fund.*

(Decided 24th March, 1891.)


MILLER, J., delivered the following separate, and, in part, dissenting opinion:

The several appeals in this case were taken from an order of the Court below passed on the 20th of August, 1890, which ratified account D and directed the fund in Court to be applied accordingly. A motion to dismiss the appeals has been made, founded on the alleged ground that they were not taken within two months from the date of the final order or decree in the case. But the appeals are within time, if the order of the 20th of August is to be treated as such final order or decree. In support of the motion it has been contended that the previous order of the 10th of July was the final and appealable order. Several accounts had been stated by the auditor, viz., account A stated under instructions of complainants' solicitors, and accounts B and C under instructions of defendants' solicitors. The case was then

argued upon exceptions to these several accounts filed on both sides, and the learned Judge on the 10th of July delivered an opinion in which he definitively decided upon all the claims presented, and approved account A "as correct in principle," and in all other respects, with the exception that it did not allow the counsel fees of Messrs. Walsh, Poe and Carter, as set forth in account C; and on the same day passed an order rejecting all the accounts, including account A, and again referred the case to the auditor to state an account in accordance with his opinion.    This order, of course, simply required the auditor to restate account A, allowing these counsel fees which that account had not allowed.    Without doubt an appeal could have been taken from this order by parties thereby aggrieved, under *section 25, Art. 5, of the Code,* because it was an order "*determining a question of right between the parties, and directing an account to be stated on the principle of such determination;*" but they were not obliged to take such appeal at the risk of having this order stand irrevocable, because the succeeding section (*sec.* 26) of the same article provides that "on appeal from a final decree or order, all previous orders which may have been passed in the cause shall be open for review in the Court of Appeals, *unless an appeal under the preceding section shall have been previously taken from such orders.*"    The parties to whom distribution was made under account A could not have received their money under the order of the 10th of July, nor until account D had been ratified by the order of the 20th of August. It seems to us clear that the latter order is the final decree or order contemplated by section 26, Art. 5, of the Code, and that an appeal from it opens for review the order of the 10th of July, and everything decided by the opinion on which that order is founded.    The motion to dismiss is therefore overruled.

The fund in Court for distribution is the proceeds of a judgment for $75,000 against the Baltimore and Ohio

Railroad Company, recovered on the 20th of March, 1885, by William A. Brydon, in the Superior Court of Baltimore City, for breach of a coal contract between him and the company dated the 17th of May, 1875. Before and at the time this contract was made, and when it was alleged to have been broken, and ever since, Brydon was, and has been the president of the "North Branch Company," a mining corporation, incorporated by the Act of 1867, ch. 309, and owned, and still owns a majority, by a few shares, of the stock of this company. It was out of the mines of this company that the coal to fulfil this contract was to be, and was, in fact, actually taken so long as the contract was in force. Two days before the verdict against the railroad company was rendered, Brydon gave an order to enter the suit to the use of Henry G. Davis & Co., the proceeds of the judgment to be recovered therein to be applied, according to certain agreements between him and Davis & Co., and it was accordingly so entered. By these agreements all the proceeds of the judgment were divided between Brydon and Davis & Co. Upon exceptions taken at the trial, the railroad company appealed, but the judgment against them was ultimately affirmed by this Court. In July, 1886, before the judgment was paid, Gemmell and Sinclair, who were minority stockholders, but owners of nearly one-half of the stock of the North Branch Company, filed their bill in the present case against Brydon, Davis & Co., the North Branch Company, and the railroad company, in behalf of themselves, and of "all creditors of the North Branch Company who may choose to come in and contribute to the expenses of the suit." The bill charges that the contract between Brydon and the railroad company was in equity the contract of the North Branch Company, and that Brydon was acting *fraudulently* in claiming it, as his own individual contract; that Davis & Co. were aiding him in the attempt to consummate this fraud

and were not *bona fide* assignees of the judgment. The prayer of the bill is for an injunction to restrain the collection of the judgment, to have the entry to the use of Davis & Co. stricken out, and the judgment declared to be the property of the North Branch Company. An injunction restraining the collection of the judgment was granted, and, upon *motion to dissolve,* testimony covering more than *seven hundred printed folio pages* was taken. In all this Brydon testified and insisted that the contract was *rightfully* his own; that he owned all the stock of the North Branch Company; and that Gemmell and Sinclair, though holders of certificates of stock, were not *bona fide* owners of the same for value The Court below, however, refused to dissolve the injunction, and passed an order continuing the same till final hearing. From that order the defendants appealed, and when the case was heard in this Court, we found, after a careful examination of this large mass of testimony, that it presented Brydon in a very unfavorable light, and showed that Davis & Co. were not *bona fide* assignees of the judgment without notice. Our opinion in that case is reported in 70 *Md.*, 358.

In that case the order continuing the injunction was affirmed, and the cause was remanded for further proceedings. When the case reached the Court below under this remand, Gemmell and Sinclair filed an amended and supplemental bill, in which they charged that Brydon was largely indebted to the North Branch Company; that the company was practically insolvent, and prayed for a decree that it be wound up, its property sold, its assets collected and distributed among the parties entitled thereto, and that a receiver be appointed for that purpose. It would have been a grave mistake if the Court below had undertaken to grant the relief thus prayed; for I take it to be clear that an equity Court in Baltimore City has no jurisdiction to wind up and dis-

solve a corporation doing business, and having its principal office located in Garrett County. *Code, Art.* 23, *secs.* 264 *to* 269. But the Court has not attempted to exercise such jurisdiction. On the contrary, after answers to the amended and supplemental bill, and after much testimony had been taken, the Court, on the 28th of September, 1889, ordered and decreed that the judgment in question was the property of the North Branch Company and not the individual property of Brydon; that the papers be referred to the auditor to state an account distributing the judgment, with interest to the parties entitled thereto; and that notice be given *to all creditors* of the North Branch Company to file their claims, properly authenticated, on or before the first day of November following. This notice was duly given, and the case then went to the auditor. Creditors came in, filed their claims, and a large amount of testimony was taken. Accounts were stated to which exceptions were filed on both sides, and the result is the order ratifying account D, from which these appeals are taken. Now, in all this, I cannot perceive that the Court below has in any wise transgressed its legitimate jurisdiction. It has simply taken possession of this judgment against the railroad company, has had the money due upon it brought into Court, and has distributed it to those whom it decided were entitled thereto. It has not dissolved the North Branch Company, nor wound up its affairs, or sold any of its property, or appointed a receiver for that purpose, nor has it, so far as I can see, forfeited or confiscated any of its stock. In making distribution the Court has taken into consideration the indebtedness of Brydon to the North Branch Company, but in doing this, it has done only what the defendants concede it had the right to do, for in their answer to the amended and supplemental bill, they state that "the claims which the plaintiffs allege said company has against Brydon and the said

Henry G. Davis & Co. *are all matters properly cognizable in this case,* and can be prosecuted by the plaintiffs as well as by a receiver appointed by the Court.'' This has accordingly been done, and account D is the result reached by the Court below. In form the account is rather more complicated than auditor's accounts usually are, but the necessities of the case required this, and I find no difficulty in understanding it.

But it has been argued that as soon as the Court decided that the judgment belonged to the North Branch Company, it should have turned the money over to that corporation to be disposed of by its board of directors. This, without doubt, would have been the proper course in an ordinary case where the corporation is regularly conducted, where directors are annually elected by the stockholders, who faithfully and honestly discharge their duties in attending to its business affairs. But here is a case where the president owns or controls a majority of the stock, and can therefore elect whom he chooses to be his co-directors, where there has been neither a stockholders nor directors' meeting for more than fourteen years; where Brydon, the president, has been charged with an attempt to cheat and defraud the company and the minority stockholders in relation to the contract for breach of which this judgment was recovered; and where throughout this long litigation the judgment both of the Court below and of this Court has been against him on that question. In our opinion in the former appeal, strong comments were made upon his conduct, and that of his co-directors, and we decided that Gemmell and Sinclair, the *minority* stockholders, who undoubtedly have an interest in the proceeds of this judgment, *had the right* to file this bill without any demand or refusal on the part of the corporate authorities to do so, because the president and directors of the corporation were themselves guilty of the wrong complained of; and it would

be against the plainest principles of justice to permit the perpetrators of the wrong to conduct a litigation against themselves.  As stated, the bill was filed by these minority stockholders in behalf of themselves, and all creditors of the North Branch Company, not only against Brydon, Davis & Co., and the railroad company, the judgment debtor, but against the North Branch Company itself, so that all parties interested were made parties to the suit.  But besides this, in our opinion affirming the order granting the preliminary injunction, and remanding the cause for further proceedings upon the motion to dissolve, we declined to pass upon the question of counsel fees, because it was *"a matter to be considered upon final hearing, when all the creditors shall have had an opportunity of coming in and being heard,"* 70 *Md.*, 579.  This was a plain direction to the Court below in its further proceedings, to give notice to creditors, and to go on and distribute the fund.  This has been done, notice to creditors has been given, and they have come in and filed their claims, and the fund has been brought into Court and distributed.  Now, for this Court, after its decision on the former appeal and its plain direction to the Court below, when the fund is rightfully in that Court, and when all parties interested in its distribution have come in and are before the Court, to arrest the proceedings at this stage of the case, and say that the money must be delivered over to the North Branch Company, which means to Brydon and his co-directors, to be distributed by them, or by direction of the Circuit Court for Garrett County in a new suit in which all this tedious litigation would have to be renewed, would amount to an intolerable outrage upon the administration of justice.  I think the Court below was entirely right in refusing to do this, and in holding on to, and making distribution of the fund.

It has also been argued that the Court below was in error in allowing Gemmell and Sinclair to plead limita-

tions to the claims filed by Davis & Co., Brydon, and
other parties, because they are minority stockholders in
whom no such right is vested, and the discretion to inter-
pose this plea is reposed exclusively in the corporation
itself.    On this point, my own view is that the ruling of
the Court below is correct.    The right of the minority
stockholders to file this bill in their own names, and to
share in the distribution of this judgment, has been
already adjudicated in their favor, and I do not think
that *corporation law* has anything to do with this case.
The general rule undoubtedly is that, whenever there is
a fund in Court for distribution, every one entitled to
share therein, has the right to plead limitations against
the claims of other parties seeking a share of the same
fund, and I see no reason why Gemmell and Sinclair
should in this case be deprived of that right.    A majority
of the Court, however, are of a different opinion, and
think the right to plead limitations belongs solely to the
corporation itself, and cannot be exercised by the mi-
nority stockholders.    In passing, therefore, upon the
validity of the claims rejected in account D, they must
be considered without reference to the plea of limita-
tions.

Viewed in this light, I have given a careful considera-
tion to each and all of the rejected claims.    We are all
of opinion there was error in rejecting what is called the
Gouverneur claim.    What is that claim ?    Brydon and
Gemmell bought on *joint account* from the Gouverneurs,
father and son, the property which, on being afterwards
transferred to the North Branch Company, constituted
its whole capital, and was the basis on which all its stock
was issued.    The deed therefor was taken in Brydon's
name, and he gave a *mortgage* on the property to secure
a balance of *purchase money*, amounting to $3600.    A
controversy arose between the Gouverneurs as to who was
entitled to this money, which was settled by this Court

in its decision in *Brydon vs. Campbell and Gouverneur*, 40
*Md.*, 331. The result of that litigation was a *decree* directing Brydon to pay the money to the two Gouverneurs
in certain proportions. This decree was not paid, and
execution upon it was threatened and ordered. Davis &
Co. then came forward, advanced the money, paid the
Gouverneurs, and had the decree *entered ·to their use.*
This is the claim, and we find nothing in the record to
impeach its justness or fairness. It has not been paid,
and we regard the decree founded on and enforcing this
mortgage, as binding upon all the property conveyed to
Brydon by the Gouverneurs, and decide that it must be
paid out of the proceeds of this judgment. Its payment
will enure as much to the benefit of Gemmell and Sinclair, as stockholders, as it will to that of Brydon, because the property of the company will be thereby relieved of an incumbrance.

A claim has been set up by Davis & Co. for money
advanced by them to Brydon for payment of witnesses
and other expenses, in the prosecution of his suit against
the railroad company. Passing by other objections to
it, it is sufficient to say I do not find this claim adequately proved. The witness, Blackistone, who was a
clerk for Davis & Co., from 1874 to March, 1887, appears
to have simply *copied* and made out the account on which
this claim is based from the books of Davis & Co. He
did not even make all the entries himself. Some were
made by another clerk, who is not produced as a witness.
He appears in most cases to have put down the entries
as directed by Mr. Henry G. Davis, and seems to have
had no personal knowledge for what purpose the money,
consisting in some cases and largely of checks and cash
items paid to Brydon, was advanced or applied. He says
Senator Davis would know about that. On many points,
and especially as to how the accounts were kept in the
books, his testimony is confused and conflicting. The

books themselves were not put in evidence so as to afford a proper basis for the cross-examination of the witness, nor did Mr. Henry G. Davis himself appear as a witness in the case.    I cannot take this mere *copy* of the account from these books made by this witness, under these circumstances, as sufficient proof of the claim.    And here I may remark, that in so far as this, or any other claim in the case purports to be supported, in whole or in part, by the testimony of Brydon, I am compelled to say he has been so thoroughly discredited as a witness in the former record, that I can place no reliance upon his testimony, nor upon any statements of accounts made out by him.

The same objection as to want of sufficient proof applies also to the claim of Davis & Co. for taxes paid for Brydon.    The North Branch Company was, of course, responsible only for taxes on its own property, and not for those upon Brydon's own house and adjacent land. But in this claim no such distinction is made.   No tax receipts by the collectors are given, and no statement from the county commissioners' office as to how much and what property was assessed on their books against the North Branch Company is furnished; and besides Blackistone in his testimony says he presumes the taxes thus paid by Davis & Co. included the taxes on Brydon's house and property.    The claim is utterly void of adequate proof, and is but one of the many efforts made to hold the North Branch Company and the minority stockholders responsible for the *individual debts* of Brydon, because he was President of that company, and owned and controlled a majority of its stock.   In fact, the appellants set up the preposterous claim that this small mining corporation, costing less than $5,000, which had been in active operation for but little more than two years, during which time it had mined and sold more than 40,000 tons of coal at a good profit, had in this

short period incurred debts to such an amount that this judgment of $75,000 was only sufficient to pay a *dividend* on their claims.    This is the result of their account B, and they ask a Court of equity to ratify it.

In regard to the coal mined by Brydon and sold to the railroad company and others, I think no injustice has been done by charging him with the amount shown by the proof, for which the coal was actually sold, and crediting him with the cost of mining the same as testified to by himself in his suit against the railroad company. No other satisfactory proof on this subject has been adduced, and I see no other mode of arriving at a satisfactory conclusion upon the subject.

I have examined with the utmost care each of the other rejected claims, and can allow none of them.    All of them are either deficient in adequate and satisfactory proof, or are not shown to be just claims against the North Branch Company, though they may be such against Brydon individually.    Some of the parties who trusted him and loaned him money seem to have regarded him and the North Branch Company *as one,* and took his individual notes as well as those signed by him as President indiscriminately.    It cannot be expected that I should protract this opinion by going into the details of each claim.    I must content myself with saying that I find no error in rejecting these claims, and that it is my opinion that the claims allowed in account D, to which no exceptions have been filed, with the Gouverneur claim which we have said must be allowed, include every well proved, just and honest claim that has been filed against the North Branch Company.

 ·  This brings me to the claims allowed in account D, to which exceptions have been taken.    These are the counsel fees allowed, and as to them I confess to have encountered much difficulty.    I deem it proper to say that I do not look with approval upon the growing practice in the

profession for counsel to undertake cases upon *contingent fees*, and then to come into Court, and by petition, either by themselves or through their clients, ask the Judges to allow the same. As a general rule, it is far better that compensation for professional services should be agreed upon and settled between counsel and client, without the intervention of the Court. Courts ought never to be troubled with such controversies, except in cases where direct suits are brought by counsel against clients to recover for professional services rendered, where the value of such services can be submitted, upon evidence, to the arbitrament of a jury. The relation of the Bench to the Bar is such that it becomes an extremely delicate matter for a Judge, at the request of counsel or client, to decide upon the value of the services of the former in any given case; and whenever it is done it almost invariably provokes unfavorable comment, and not unfrequently casts merited suspicion and reproach upon the administration of justice. Some of the most able and honorable lawyers in the country rarely undertake a case on a contingent fee, and never where the client is able to pay them for their services. Cases, however, may sometimes occur in which, without the allowance of such fees, justice might be defeated, and redress denied to the poor and the oppressed, and it was upon this ground that the Courts first allowed the payment of such fees. Afterwards the validity of such fees was generally recognized, and it has been so recognized by our predecessors in this Court. To such an extent has this doctrine been carried that at the present time it is not unusual for Courts to allow and enforce the payment of counsel fees in many other cases, especially where they are to be paid out of a fund in Court which counsel by their services have contributed to produce. I must therefore deal with the case before me according to the law as I find it established, and not

upon my own individual opinion, however strong, as to what it ought to be.

Messrs. Walsh, Poe and Carter were counsel for Brydon in his suit against the railroad company. They made contracts with him for contingent fees of a certain percentage out of the amount to be recovered. If there was proof that their services were rendered to Brydon with the *knowledge* that he was prosecuting the suit for his own individual benefit, and with the intent and purpose of cheating and defrauding the North Branch Company and his co-stockholders, Gemmell and Sinclair, out of any share in the judgment to be recovered, their claim for compensation could not for a moment be listened to by a Court of equity. But there is no proof in the record to show they had such knowledge, and the high character and eminence in their profession of these gentlemen forbid even a suspicion on that subject. They acted honestly and faithfully in the prosecution of the suit, and, without doubt, their services were mainly instrumental in securing the judgment for this large sum of which Gemmell and Sinclair are now seeking to take advantage. I think it would be inequitable for them to do this without allowing these counsel their fees. The claims for these allowances are not made by petitions filed by their client, according to the usual practice, but by petitions filed by themselves in their own names; and it is only by treating them as *bona fide assignees* of their proportional parts of the judgment, as specified in the contracts for their contingent fees, that relief can be granted them. I think they are entitled to be so treated, and that the ruling of the Court allowing their claims should be affirmed.

Messrs. Marbury and Cross have been and are counsel in this case for Gemmell and Sinclair, and have aided them in their effort to rescue the judgment from the control of Brydon and Davis & Co. They also had con-

Davis, Brydon, *et al. vs.* Gemmell, *et al.*

tingent fees dependent upon their success, but not for any specified percentage. They have succeeded, and the only objection made to their claim is that the amount allowed is unreasonable and excessive. Here I am confronted with the delicate and unpleasant duty of passing judgment upon the value of the professional services of these gentlemen. The litigation has lasted more than five years, and has been hotly contested at every step. A very large and unusual amount of testimony has been taken, and their labors have been constant and exhausting. I have the emphatic endorsement of the claim by the learned Judge of the Court below, who says in his opinion that the labor performed by these counsel in his Court "has been simply immense, largely done, too, under the eyes of the Court;" and he overruled the objection that the amount claimed is excessive. I have also the endorsement of the claim as reasonable and just by two of the most eminent lawyers in Baltimore City and in the State. In this Court I have personal knowledge of the elaborate and exhaustive briefs filed by them in both appeals, and of the ability and zeal displayed by them in argument. Under these circumstances my own opinion is that the judgment of the Court below allowing this claim ought to be affirmed, and that the claim itself, though large, is neither unreasonable nor excessive. A majority of the Court, however, are of opinion these counsel should be allowed the sum of $7,000 each out of the fund in Court, and that for any additional compensation they must look to their clients. Such is therefore the judgment of this Court upon this question.

(Filed 24th March, 1891.)