845 A.2d 16

**M. Raul GARCIA**

v.

**FOULGER PRATT DEVELOPMENT, INC., et al.**

**F.P. Rockville Limited Partnership**

v.

**M. Raul Garcia.**

**No. 1483, Sept. Term, 2002.**

Court of Special Appeals of Maryland.

Dec. 4, 2003.

Reconsideration Denied March 8, 2004.

636

638

640

Read K. McCaffrey, Benjamin D. Wood (Patton Boggs, L.L.P., on brief), Washington, DC, for Appellant.

David Clarke, Jr., Sara Z. Moghadam (Piper Rudnick, L.L.P., on brief), Washington, DC, for Appellee.

Panel: GREENE, SHARER, CHARLES E. MOYLAN, Jr. (Retired, Specially Assigned), JJ.

SHARER, Judge.

The parties to this appeal, and consolidated cross-appeal, are M. Raul Garcia, appellant/cross-appellee, and three appellees/cross-appellants comprising several business entities that are engaged in the development and management of commercial real estate properties. The appeals and cross appeals are taken from a judgment and order of the Circuit Court for Montgomery County, Hon. William J. Rowan, presiding.

Garcia (plaintiff below) is one of two limited partners in the F.P. Rockville Limited Partnership ("the Partnership"), holding a 10% equity interest in the Partnership. Appellees (defendants below) are (1) Foulger Investments, Inc. ("Foulger"), the general partner of F.P. Rockville Limited Partnership, ("F.P. Rockville"), holding a 2% equity interest; (2) FP Investments, LLC ("FP Investments"), the other limited partner in the F.P. Rockville Limited Partnership, holding an 88% equity interest; and (3) Foulger–Pratt Development, Inc. ("Foulger–Pratt").

Garcia, a former salaried employee of Foulger–Pratt entered into a partnership agreement, in lieu of salary from the Foulger entities, for his services to identify and process new commercial real estate projects. The partnership agreement contemplated that new "limited partnerships" would be created to oversee development of each individual phase in the overall project site. The new entities would be known as "Operating Partnerships." Garcia identified a project site, and the Partnership formed a limited liability company (with an unrelated business entity) called the Rockville Metro Plaza I, L.L.C., rather than creating an off-shoot limited partnership as anticipated by the partnership agreement.

Garcia brought this action against the Foulger entities alleging, among other things, that the general partner (Foul-

ger Investments, Inc.) of F.P. Rockville Limited Partnership had breached the partnership agreement by failing to assign him a direct 5% interest in the Rockville Metro I Plaza, L.L.C. project, and for wrongfully taking a $934,000 development fee that should have enured to the Partnership. The circuit court agreed with Garcia that the Partnership was entitled to the development fee. The court, however, concluded that Garcia was not entitled to a direct 5% interest in the limited liability company because he failed to prove that the limited liability company constituted an "Operating Partnership" as contemplated by the agreement.

Garcia, therefore, raises the following questions for our review:

I. Did the circuit court err in concluding that Rockville Metro Plaza I, L.L.C. (the entity formed to own the first building) was not an "Operating Partnership" as that term is defined in Paragraph 3.01 of the Partnership Agreement?

II. If this Court answers the first question in the affirmative, should appellant be assigned a direct interest in Rockville Metro Plaza I, L.L.C.?

III. If this Court rules that the general partner of the Partnership breached the Partnership Agreement by failing to assign appellant a direct interest in Rockville Metro Plaza I, L.L.C. does that ruling—coupled with the trial court's ruling—warrant dissolution of the Partnership and the appointment of a receiver?

We answer "no" to the first question, and because appellant's second and third questions are framed in the alternative, we need not address those issues.

The cross-appeal in this case deals with the award of attorneys fees to Garcia related to recovery of the development fee to the Partnership. The court awarded Garcia $96,000 in attorneys' fees, and at the same time denied Foulger–Pratt's request for attorneys' fees under Maryland Rule 1–341.

In its cross appeal, Foulger–Pratt has raised four questions for our review which we have condensed into two questions for clarity:

I. Whether the trial court abused its discretion, or otherwise erred, when it awarded Garcia his requested attorneys' fees, including fees for unsuccessful claims that the court determined where "reasonably related" to his successful claim?

II. Whether the trial court abused its discretion, or otherwise erred, when it denied Foulger–Pratt's request for attorneys' fees under Maryland Rule 1–341?

We answer "no" to both questions, as discussed more fully within, and shall affirm.

## FACTUAL and PROCEDURAL HISTORY

In 1989, Foulger–Pratt Development, Inc., hired Garcia, under a two-year employment agreement, to manage its real estate development and investment activities. Pursuant to the employment agreement, Garcia earned an annual base salary of $85,000, plus bonuses and benefits.

After July 1, 1991, when the employment agreement had ended, Garcia continued to work for the Foulger entities, but no longer received a salary. Between 1991 and 1994, Garcia rendered services to the Foulger entities under a personal services contract. The agreement was not memorialized until April 14, 1994, but was applied retroactively to 1991 and extended his services for one additional year, until April 25, 1995. Garcia's duties and responsibilities under the personal services contract included "the identification and processing of new business opportunities to the point that they can be developed." In lieu of a salary, Garcia was to receive a 10% equity interest as a limited partner in a "limited partnership ... formed between [Garcia] and an assignee of Foulger–Pratt [created] for the purpose of developing, constructing, and owning the project."[1] In short, each time Garcia identi-

---

1. In full, the compensation provision of the Personal Service Agreement states:

fied and processed a new development "project" a new limited partnership would be created, in which Garcia would have a 10% equity interest as a limited partner. The Foulger entities would retain a 90% equity interest in each limited partnership.

Garcia identified a parcel of real estate for potential commercial development in downtown Rockville, bounded by Middle Lane and Hungerford Drive ("the Rockville Property"). He concluded a contract to purchase the property from the City of Rockville and negotiated the bureaucracy to obtain the necessary permits and support for the development of the site.

As envisioned in the personal service agreement, the F.P. Rockville Limited Partnership ("the Partnership") was created to develop the Rockville Property. Foulger Investments, Inc., served as the general partner of the Partnership, with a 2% equity interest. The two limited partners included FP Investments, LLC, with an 88% equity interest, and Garcia with a 10% equity interest. Pertinent provisions of the Partnership Agreement include the following paragraphs: [2]

> **3.01 Business.** The business of the Partnership shall be to negotiate contracts to acquire the parcels of real property [at the site in Rockville, otherwise known as "the Project"]; enter into option contracts with respect to the Project; make option payments, deposits and other payments to the owners of the Project; negotiate zoning variances, site plan

---

> Prior to entering into an agreement to control the site for a potential development, a limited partnership shall be formed between you and an assignee of Foulger–Pratt for the purpose of developing, constructing, and owning the project. Foulger–Pratt shall be the general partner with an equity interest equal to ninety percent (90%), and you shall be a limited partner with an equity interest equal to ten percent (10%). Subject to the other express terms of this Agreement (i.e., repayment of partner advances and interest on partner advances, if any), cash flow, profit and loss, mortgage and sale proceeds and any other benefits shall be distributed on the basis of each party's equity interest (i.e. 90% to Foulger–Pratt and 10% to you).

**2.** The Partnership Agreement also included a merger/integration clause, stating that the agreement "contains the entire understanding among the parties hereto and supersedes all prior written or oral agreements among them respecting the within subject matter, unless otherwise provided herein."

approvals, proffers, locate tenants, secure financing and equity investors; and take all other actions necessary or advisable to develop or maintain the Project.

The Project has been zoned to permit construction of over one million square feet of commercial office space as well as multi-family residential uses. The General Partner current-ly plans to develop the Project by constructing three com-mercial office buildings on the IBEW Site, two commercial office buildings on the Middle Lane Site, and a residential tower on the Middle Lane Site. However, the General Partner may change those plans as it deems appropriate. *The General Partner expects to divide the Partnership pursuant to [Internal Revenue Service] Code Section 708(b)(2)(B) and establish separate limited partnerships (the "Operating Partnerships") to own, finance, manage, dispose of, lease and otherwise operate each building constructed as part of the Project. The ownership of the Operating Partnerships may differ from the Interests set forth in Schedule B hereto to take into account the contributions of each of the Partners, admission of addi-tional equity investors, and other factors.*

*In addition, the Partnership may engage in any other lawful activity for profit permitted under the Act.*

\* \* \*

**4.03 Additional Funds.** *If the General Partner deter-mines that the Partnership or any of the Operating Partnerships require funds in addition to the Capital Contributions, the General Partner is authorized to ad-mit additional Partners to the Partnership and the Oper-ating Partnerships,* from time to time, upon such terms and conditions as it determines to be appropriate, which shall result in a *pro rata* dilution of the Interests of the Partners, *provided,* such additional Partners shall not be Affiliates of the General Partner or Limited Partners, or persons related to the General Partner or Limited Partners unless the General Partner obtains the prior written consent of Raul Garcia, which consent shall not be unreasonably withheld, conditioned or delayed.[ ]

\* \* \*

**4.07 Issuance of Additional Interests in Operating Partnerships.** *Upon formation of each Operating Partnership established to own a commercial office building developed on the IBEW site (pursuant to Paragraph 3.01), the General Partner shall issue interests therein to the Partners, including Raul Garcia, in the amounts set forth in Schedule B, provided,* that (i) under the circumstances described in Paragraph 4.08(D), the General Partner may reduce the interest of Raul Garcia in certain of the Operating Partnerships, and (ii) such interests may very [sic] from Schedule B to take into account additional capital contributions of the Partners, and to reflect admission of one or more additional equity investors to the Operating Partnership(s).

\* \* \*

**6.01 General Partner.** Except as provided expressly herein, the General Partner [Foulger–Pratt Development, Inc.] shall have full, exclusive and complete authority, discretion, obligation and responsibility to make all decisions affecting the business of the Partnership. The General Partner shall manage and control the affairs of the Partnership to the best of its abilities and shall use its best efforts to carry out the business of the Partnership. *The General Partner shall have authority to enter into such contracts as it determines to be appropriate on behalf of the Partnership and bind the Partnership by execution of documents, including deeds, mortgage documents, deeds of trust, promissory notes, leases, construction contracts, management contracts, contracts of sale, such documents as may be required to admit equity investors, and any other document not inconsistent with the provisions of this Agreement.*

\* \* \*

**6.03 Compensation; Business with Affiliates.** Except as specifically provided herein, no Partner shall be entitled to compensation for services rendered on behalf of the Partnership. The General Partner shall not cause the

Partnership to enter into any contract with any Partner or any Affiliate of any Partner without the prior written consent of all Partners, which consent shall not be unreasonably withheld, conditioned or delayed, *provided, however,* that the General Partner is specifically authorized to enter into the following contracts with its Affiliates: [A. Foulger–Pratt Construction shall serve as general contractor for the project; B. Foulger–Pratt Management shall serve as the management agent for the project; and C. Pioneer Building Services, Inc., will provide cleaning services for the building].

(Emphasis added in bold italics).

In order to actually develop the first building on the Rockville Property, the Partnership in turn entered into an "Operating Agreement" with an unrelated entity known as Reedy Creek Investments/Rockville LLC, to form an entity known as Rockville Metro Plaza I, L.L.C. ("Rockville Metro Plaza"), which would directly oversee the development of the property.[3] Both the Partnership and Reedy Creek received a 50% interest in Rockville Metro Plaza.[4] As such, Garcia now had a 5% indirect interest in the Operating Agreement (i.e., a 10% limited partnership interest in the 50% L.L.C. interest). Also, according to the Operating Agreement, the Partnership was entitled to a $934,000 development fee.[5] Rockville Metro

---

3. According to the Operating Agreement, Rockville Metro Plaza was organized "solely to purchase, acquire, buy, sell, own, hold, develop, lease, manage, and otherwise deal with the Property, and to do any and all things necessary, convenient, or incidental to that purpose." The Partnership and Reedy Creek entered into the Operating Agreement on December 31, 2000.

4. Reedy Creek contributed $3.5 million in cash to actually buy the property for the first building, and the Partnership contributed its contractual right to purchase the property.

5. The Operating Agreement specifically provided, "[The Partnership] shall be paid a development fee by [Rockville Metro Plaza I] equal to two and 06/100 percent (2.06%) of total project costs up to Forty–Five Million Four Hundred Forty–Eight Thousand Two Hundred and 00/100 Dollars ($45,448,271.00). . . ." Apparently, the development fee was initially set around $1.4 million, but because of a shortfall of equity

Plaza, however, paid the development fee to Foulger–Pratt Development, Inc. (Garcia's initial employer, and an entity in which Garcia had no equity interest), rather than to the Partnership.

Garcia filed a lawsuit against the various Foulger entities on September 7, 2001, alleging that (1) he should have had a 5% direct interest in any new "Operating Partnerships" (according to his interpretation of Paragraph 4.07 of the Partnership Agreement) instead of a 5% indirect interest, and (2) the development fee had been wrongfully taken by Foulger–Pratt Development, Inc. Garcia sought judgment for breach of contract, dissolution of the Partnership, and attorneys' fees related to the breach of contract claim regarding the development fee, in addition to other causes of action not relevant to this appeal. After protracted pre-trial activity, Garcia filed a second amended complaint on June 24, 2002.[6]

That second amended complaint came to trial in the circuit court July 9, 2002. During the trial, lasting four days, twenty-six exhibits were admitted into evidence and five witnesses testified. The court took the case under advisement on July 15, 2002, and issued a memorandum opinion and order on July 29, 2002. The court ruled that appellees had not breached the Partnership Agreement by not granting Garcia a direct 5% interest in Rockville Metro Plaza, because Rockville Metro Plaza was established as a limited liability company and not a

---

between the Partnership and Reedy Creek in the contribution, the Partnership agreed to reduce the development fee.

6. On May 7, 2002, Garcia filed an amended complaint which did not include any breach of contract claim for the development fee. Apparently, he did so based on representations by defendants that the development fee had already been returned to the Partnership. Counsel for defendant wrote in a letter on June 19, 2002:

Recently, it has become known that the payment of the development fee to [the Partnership] has not yet occurred but will occur 'on the books' at some pre-determined future time.

Therefore, my previous correspondence clearly indicating a more immediate payment, was not completely accurate. You may then want to 'reinstate' those claims which were amended out because of the wording of my letter, which of course will not be opposed.

limited partnership, and therefore the limited liability company could not be an "Operating Partnership" as described in the Partnership Agreement.

The court, however, did find that the Partnership, and not Foulger–Pratt Development, Inc., was entitled to the development fee. The court also ordered a future hearing on the attorneys' fees that were incurred by Garcia in recovering the development fee to the benefit of the Partnership. Lastly, the court declined to order dissolution of the Partnership.

The court wrote the following in its extensive memorandum opinion:

In 1998 F.P. Rockville, Limited Partnership, was created. Foulger Investments, Inc., is the general partner with a 2% interest. F.P. Investments, Inc., and Garcia are the limited partners, with an 88% and 10% interest, respectively. (See Defendants' Exhibit I.)

The purpose of this Agreement was to take all actions necessary or advisable to develop or maintain the Rockville property purchased from IBEW. See Section 3.01. It recited that the "general partner" expects to divide the partnership pursuant to [Internal Revenue Service] Code, Section 708(b)(2)(B), and establish separate limited partnerships (the "Operating Partnerships") "to own, finance, manage, dispose of, lease and otherwise operate each building constructed as a part of the project". See Section 3.01. If "Operating Partnerships" were formed, the general partner was to issue interest to the partners, "including Raul Garcia" in roughly the same percentage interest as set forth in the formation of the Limited Partnership. See Section 4.07. The Agreement contained an integration clause providing that it superseded all prior written or oral arguments among the parties concerning the subject matter. See Section 13.12.

In order to secure construction financing from Reedy Creek Investments, the Limited Partnership entered into an agreement with Reedy Creek on December 31, 2000, entitled "Operating Agreement of Rockville Metro Plaza I,

LLC". See Defendants' Exhibit 2. F.P. Rockville, Limited Partnership, and Reedy Creek Investment each received a 50% interest. Garcia received no written interest.

* * *

The Court finds that [Garcia] has failed to prove by a preponderance of the evidence that the "Operating Agreement of Rockville Metro I, LLC" is an "Operating Partnership" contemplated under Section 3.01 of the Limited Partnership Agreement. The operative words [of Section 3.01] are "expects to divide the partnership pursuant to Code, Section 708(b)(2)(b), and establish separate *limited partnerships* (the "operating partnerships")". (Emphasis supplied).

Metro Plaza I, LLC, is not a "limited partnership" formed by two or more persons having one or more general partners and one or more limited partners. See Corporations and Associations Article, Section 10–101(i). Metro Plaza I, with 50% owners, has no delineation of general or limited partners. It was not a limited partnership converted to a limited liability company under Corporation and Associations, Section 4A–211. Rather, Metro Plaza I, LLC, is a limited liability company formed under Corporation and Associations, Title 4A.

No reference was made in the formation of Rockville Metro Plaza I, LLC, to IRS Code Section 708(b)(2)(B), which the Court believes significant because of the decisions in this case which were tax driven. While Section 4.03 of the Limited Partnership Agreement does not allow the creation of a new subsidiary that is not an operating partnership for the purposes of securing additional funding (construction financing), Section 6.01 does allow under it broad powers, the general partner to direct the formation of an LLC, such as Metro Plaza I, LLC.

Finally, the formation of Metro Plaza I, LLC, is referred to as an "Operating Agreement", not an "Operating Partnership". Accordingly, Mr. Garcia because of a failure the burden of proof is not entitled to a separate stated 5% interest in Metro Plaza I, LLC, under Section 4.07 of the Limited Partnership Agreement.

As to the development fee, (subparagraph b), the Court finds [Garcia] has proved by a preponderance of the evidence that the Limited Partnership was entitled to the payment and receipt of the development fee.

Garcia filed a timely appeal. Additional facts will be set forth as necessary.

## DISCUSSION

*I.* *Did the circuit court err in concluding that Rockville Metro Plaza I, L.L.C. (the entity formed to own the first building) was not an "Operating Partnership" as that term is defined in Paragraph 3.01 of the Partnership Agreement?*

■ It is undisputed that Garcia has a 5% interest in Rockville Metro Plaza. What is disputed, however, is whether his interest is direct or indirect (i.e., a 10% interest in the Partnership's 50% interest in Rockville Metro Plaza). Garcia contends that he has a direct 5% interest pursuant to the Partnership Agreement, and that he has been significantly harmed by the difference.[7] Specifically, Garcia points to the language of the Partnership Agreement, Paragraph 4.07,[8] which he reads together with Paragraph 3.01,[9] to support his position.

---

7. Garcia alleges that there is approximately a $135,000 difference between the direct and indirect interest. Garcia testified that "the entity that owns the dirt in the business is generally regarded as more valuable than the secondary or higher tier interest." Moreover, a direct interest would be more freely transferrable, unlike his indirect interest.

8. "Upon formation of each Operating Partnership established to own a commercial office building developed on the [Rockville Property] (pursuant to Paragraph 3.01), the General Partner shall issue interests therein to the Partners, including Raul Garcia...."

9. "The General Partner expects to divide the Partnership pursuant to Code Section 708(b)(2)(B) and establish separate limited partnerships (the 'Operating Partnerships') to own, finance, manage, dispose of, lease and otherwise operate each building constructed as part of the Project."

Garcia posits that the matter is one of pure law (contract interpretation), and therefore the issue is subject to *de novo* review. *See Turner v. Turner,* 147 Md.App. 350, 403, 809 A.2d 18 (2002). Appellees posit the opposite-that the issue is strictly one of fact-and that the trial court's factual findings should be affirmed unless they are clearly erroneous. *See* Md. Rule 8–131(c); *Brown & Sturm v. Frederick Road Limited P'ship,* 137 Md.App. 150, 170, 768 A.2d 62 (2001).

▮ Both are correct and incorrect at the same time. The issue before us raises mixed questions of law and fact because our inquiry actually raises two different sub-issues, for which two different standards of review apply. We must first determine whether, as a matter of law, the term "Operating Partnership" in the Partnership Agreement includes limited liability companies (in this case Rockville Metro Plaza). Second, assuming that the term "Operating Partnership" does not encompass limited liability companies, we must determine whether, as a matter of fact, Rockville Metro Plaza is, or should be considered, an "Operating Partnership" for purposes of the Partnership Agreement. Given the two differing standards of review, this Court's discussion in *Gregg Neck Yacht Club, Inc. v. County Comm'rs of Kent County,* 137 Md.App. 732, 769 A.2d 982 (2001) is instructive. There, Judge Hollander wrote:

When, as here, an action is tried without a jury, we review the case on both the law and the evidence. We will not set aside the judgment of the trial court on the evidence unless clearly erroneous. Rule 8–131; *see Gwynn v. Oursler,* 122 Md.App. 493, 502, 712 A.2d 1072, *cert. denied,* 351 Md. 662, 719 A.2d 1262 (1998); *see also Murphy v. 24th Street Cadillac Corp.,* 353 Md. 480, 497, 727 A.2d 915 (1999); *Innerbichler v. Innerbichler,* 132 Md.App. 207, 229, 752 A.2d 291, *cert. denied,* 361 Md. 232, 760 A.2d 1107 (2000). The clearly erroneous standard requires an appellate court to " 'consider the evidence produced at trial in a light most favorable to the prevailing party.' " *Murphy,* 353 Md. at 497, 727 A.2d 915 (citation omitted). A trial court's findings

are clearly erroneous when they are not supported by substantial evidence. *Id.*

The clearly erroneous standard only applies to the lower court's findings of fact, however. *B & P Enter. v. Overland Equip. Co.,* 133 Md.App. 583, 602, 758 A.2d 1026 (2000); *Nationwide Ins. Companies v. Rhodes,* 127 Md.App. 231, 235, 732 A.2d 388 (1999); *Piper v. Layman,* 125 Md.App. 745, 754, 726 A.2d 887 (1999). When we consider conclusions of law, our review is more expansive. *Narayen v. Bailey,* 130 Md.App. 458, 461–62, 747 A.2d 195 (2000). We do not accord any deference to "[p]ure conclusions of law." *Oliver v. Hays,* 121 Md.App. 292, 306, 708 A.2d 1140 (1998); *see B & P Enter.,* 133 Md.App. at 602, 758 A.2d 1026; *Porter v. Schaffer* 126 Md.App. 237, 259, 728 A.2d 755, *cert. denied,* 355 Md. 613, 735 A.2d 1107 (1999). Instead, we must determine whether the trial court was legally correct. *Andy's Ice Cream, Inc. v. City of Salisbury,* 125 Md.App. 125, 137, 724 A.2d 717, *cert. denied,* 353 Md. 473, 727 A.2d 382 (1999).

Id. at 751–52, 769 A.2d 982.

### Construction of The Partnership Agreement

Implicit in the trial court's holding is its finding that the Partnership Agreement's term, "Operating Partnership", does not include limited liability companies. Garcia correctly points out that "[t]he construction of a written contract is a question of law, subject to *de novo* review by an appellate court." *Turner, supra,* 147 Md.App. at 403, 809 A.2d 18 (citation omitted).

The principle rule in construction of a contract, here the Partnership Agreement, is to "ascertain and effectuate the intention of the contracting parties." *Id.* at 403, 809 A.2d 18. In order to do so, we look at the plain-meaning of the contract itself, and review the entire document. *Id.* at 403–04, 809 A.2d 18. "[T]he terms of the agreement are construed consistent with their usual and ordinary meaning, unless it is apparent that the parties ascribed a special or technical mean-

ing to the words." *Id.* at 404, 809 A.2d 18 (citations omitted). Because Maryland follows the law of objective contract interpretation, "[t]he clear and unambiguous language of an agreement will not give way to what the parties thought the agreement meant or was intended to mean." *Blakehurst v. Baltimore County,* 146 Md.App. 509, 523, 807 A.2d 179 (2002) (citations omitted).

F.P. Rockville Limited Partnership was set up as a Maryland limited partnership. Maryland law defines a limited partnership as "a partnership formed by two or more persons under the laws of the State having one or more general partners and one or more limited partners." Md.Code Ann., Corps. & Ass'ns § 10–101(i) (Repl.Vol.1999). Rockville Metro Plaza, on the other hand, was organized as a Maryland limited liability company. Maryland law defines a limited liability company as "a permitted form of unincorporated business organization which is organized and existing under this title." Md.Code Ann., Corps. & Ass'ns § 4A–101(*l*) (Repl.Vol.1999 & Supp.2002). Limited partnerships and limited liability companies are different legal entities under Maryland law, governed by separate provisions of the Corporations and Associations Article of the Maryland Code—Title 10 governs limited partnerships whereas Title 4A covers limited liability companies. Md.Code Ann., Corps. & Ass'ns Title 10 & Title 4A; *see also Provident Bank v. DeChiaro Ltd. P'ship,* 98 Md.App. 596, 606, 634 A.2d 973 (1993), *cert. denied,* 334 Md. 210, 638 A.2d 752 (1994).

Turning to the specific language of the Partnership Agreement, the term "Operating Partnership" is defined in Paragraph 2.21 as "[a]ny limited partnership established pursuant to Paragraph 3.01, and in which Interest[s] are issued to the Partners hereof, and/or additional equity investors pursuant to Paragraphs 3.01, 4.03 and 4.07." The term "limited partnership" is not defined in the Agreement, but the Agreement does refer to the Maryland Revised Uniform Limited Partnership Act (Title 10 of the Maryland Code, Corps. & Ass'ns Art.) as the governing authority. *See* Paragraph 2.01 and 3.01 ("[T]he Partnership may engage in any other lawful activity

for profit permitted under [Title 10 of the Maryland Code, Corps. & Ass'ns Art.]").

We find that the term "Operating Partnership" is clear and unambiguous, and does not on its face include limited liability companies. Reading the contract objectively, as we must, we find that the intent of the parties was to establish "limited partnerships" as that term is defined by Maryland law. *See* Md.Code Ann., Corps. & Ass'ns § 10–101(i). Accordingly, we hold that the court did not err, as a matter of law, in its implicit conclusion that the term "Operating Partnerships" applies only to limited partnerships.

### Is Rockville Metro Plaza an Operating Partnership, or Should it be Considered as Such?

■ The second inquiry is whether, as a matter of fact, Rocvkille Metro Plaza is, or should be considered to be, an Operating Partnership for purposes of the Partnership Agreement. It is this issue that both parties have more fully addressed, and that drew the trial court's attention as well.

Garcia cites several propositions for his position, relying essentially on the fact that Rockville Metro Plaza I, has elected to be taxed as a partnership for federal income tax purposes. He writes, "Because Rockville Metro Plaza elected to be treated as a partnership, it is therefore considered a 'partnership' under the federal tax laws, including the Code section applicable here." Following this theory, Garcia also argues that the creation of Rockville Metro Plaza constitutes a "division" of a partnership which, for federal tax purposes, the resulting partnership is "considered a continuation of the prior partnership." *See* 26 U.S.C. § 708(b)(2)(B).[10] Lastly, Garcia argues that Paragraph 4.03 of the Partnership Agreement

---

**10.** 26 U.S.C. § 708(b)(2)(B) states in full:

Division of a partnership—In the case of a division of a partnership into two or more partnerships, the resulting partnerships (other than any resulting partnership the members of which had an interest of 50 percent or less in the capital and profits of the prior partnership) shall, for purposes of this section, be considered a continuation of the prior partnership.

precluded the Partnership from admitting equity investors (here Reedy Creek) into any entity other than an Operating Partnership. Specifically, Garcia maintains that "Paragraph 4.03 ... specifies only two ways in which the General Partner is authorized to raise funds from a third party investor: borrowing the money, or admitting the investor into the Partnership of an 'Operating Partnership.'" In summary, Garcia's position, in simple terms, is that even though Rockville Metro Plaza is not legally a "duck," (i.e., a limited partnership) it looks, acts, walks, and sounds like one, and therefore should be treated as one.

Appellees, predictably, argue the opposite. They respond by arguing, first, that simply because a business entity is treated as a limited partnership for federal tax purposes does not mean that it is, or should be, otherwise considered a limited partnership; especially if Maryland law would not treat it as such, or more importantly, when the Partnership Agreement (i.e., the contract binding the parties) does not treat it as such. Second, appellees posit that Rockville Metro Plaza was not formed by a division of a partnership, but rather as a distinct limited liability company. Finally, appellees argue that Paragraph 6.01 authorized the general partner of the Partnership to enter into a limited liability company. In other words, appellees maintain that Rockville Metro Plaza cannot be a "duck" because, despite its appearance, it is not legally a duck. Appellees emphasize that the court's ruling involved findings of fact on this issue, and that we must affirm unless the court was clearly erroneous.

The trial court concluded that Garcia "has failed to prove by a preponderance of the evidence that the 'Operating Agreement of Rockville Metro I, LLC' is an 'Operating Partnership' contemplated under Section 3.01 of the Limited Partnership Agreement." In so concluding, the court found the following: (1) Rockville Metro Plaza is not a limited partnership as defined by Maryland law; (2) there has been "no delineation of general or limited partners"; (3) the limited liability company had no prior existence as a limited partnership; (4) Rockville Metro Plaza has been organized as a. limited liability

company under the laws of the state; (5) "No reference was made in the formation of Rockville Metro Plaza I, LLC, to IRS Code Section 708(b)(2)(B), which the Court believes significant because of the decisions in this case which were tax driven"; (6) Paragraph 6.01 of the Partnership Agreement authorizes the general partner to form a limited liability company; (7) the formation of the limited liability company refers to a "Operating Agreement" not an "Operating Partnership."

We are unable to conclude that the trial court's factual findings were clearly erroneous. Simply because a limited liability company chooses to be treated like a partnership for federal income tax purposes does not overcome the requirement of Maryland statutory law, or dictate its legal status for purposes of Maryland law. This is especially true given the fact that the section of the Internal Revenue Service Code which Garcia cites for his proposition (Code Section 708(b)(2)(B)) clarifies that it applies "for purposes of this section...." *See* 26 U.S.C. § 708(b)(2)(B). In this regard, we reiterate that because we are reviewing facts as found by the court, those facts must be viewed in a light most favorable to appellees. *Gregg Neck, supra,* 137 Md.App. at 751–52, 769 A.2d 982. We find the court's factual findings to be extensive, clear, and entirely supportable by the evidence in the record. Even our independent review of the record suggests that Metro Rockville Plaza is not, and should not be considered to be, an operating partnership as that term is defined and used in the Partnership Agreement. Furthermore, we agree that Paragraph 6.01 gave the general partner the authority to form a limited liability company for purposes of admitting equity investors.

There is yet another compelling reason why Garcia is only entitled to a 5% indirect interest, although the trial court never directly addressed this point. Garcia was not able to prove by a preponderance of the evidence that he was actually entitled to a **direct** interest versus an **indirect** interest. The operative language of Paragraph 4.07 the Partnership Agreement is "the General Partner shall issue interests...." On

this, we note that there is no dispute that Garcia was issued, and has, a 5% interest in the limited liability company, created through his 10% interest in the Partnership. However, nowhere in the Partnership Agreement is it provided that Garcia is entitled to a **direct** interest. We find no error in the court's rulings.

## ATTORNEYS' FEES

*I. Whether the trial court abused its discretion, or otherwise erred, when it awarded Garcia his requested attorneys' fees, including fees for unsuccessful claims that the court determined were "reasonably related" to his successful claim?*

Following Garcia's timely appeal of the substantive issues, Garcia and Foulger–Pratt briefed the attorneys' fees issue. Even though prevailing parties are generally barred from recovering their attorneys' fees under the "American Rule," Garcia sought fees associated with the recoupment of the $934,000 development fee pursuant to the "common-fund doctrine." The trial court awarded Garcia $96,000 in attorneys' fees. Foulger–Pratt posits that the trial court erred in this regard.

### The American Rule

Maryland follows the "American Rule" for attorneys' fees. *Hess Constr. Co. v. Bd. of Educ.*, 341 Md. 155, 159, 669 A.2d 1352 (1996). As such, "[i]n the absence of statute, rule, or contract expressly allowing recovery of attorneys' fees, a prevailing party in a lawsuit may not ordinarily recover attorneys' fees." *Bausch & Lomb Inc. v. Utica Mut. Ins. Co.*, 355 Md. 566, 590–91, 735 A.2d 1081 (1999). As with most legal principles, however, exceptions do exist. *See generally Hess Constr. Co., supra,* 341 Md. at 160–61, 168–70, 669 A.2d 1352.[11]

---

11. Hess Constr. Co. recognized recovery of attorneys' fees in (1) malicious prosecutions; (2) cases "[w]here the wrongful conduct of a defendant forces a plaintiff into litigation with a third party,"; (3)

Exceptions to the American Rule are premised on underlying equitable or policy considerations which support the need for such recovery. *See Mills v. Electric Auto–Lite Co.*, 396 U.S. 375, 391–92, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970). Relevant exceptions in this case include: (1) the "common-fund doctrine"; (2) a statutory fee-shifting provision for derivative suits in a limited partnership pursuant to Md.Code Ann., Corps. & Ass'ns § 10–1004; and, as discussed *infra*, (3) the award of attorney fees via Md. Rule 1–341 when a lawsuit is maintained or defended in "bad faith or without substantial justification...."

### The Common–Fund Doctrine, a Common Law Exception to the American Rule

In *Boeing Co. v. Van Gemert*, 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980), the U.S. Supreme Court had the opportunity to apply the common-fund doctrine as an exception to the American Rule. Justice Powell, writing on behalf of the eight-Justice majority, described the doctrine as follows:

> Since the decisions in *Trustees v. Greenough, 105 U.S. 527, 26 L.Ed. 1157 (1882), and Central Railroad & Banking Co. v. Pettus, 113 U.S. 116, 5 S.Ct. 387, 28 L.Ed. 915 (1885),* this Court has recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole. See *Mills v. Electric Auto–Lite Co., 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970); Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939); cf. Hall v. Cole, 412 U.S. 1, 93 S.Ct. 1943, 36 L.Ed.2d 702 (1973).* The common-fund doctrine reflects the traditional practice in courts of equity, *Trustees v. Greenough, supra, 105 U.S. at 532–537,* and it stands as a well-recognized exception to the general principle that requires every litigant to bear his own attorney's fees, *Alyeska Pipeline Service Co. v. Wilderness*

---

insurance cases where a liability insurer denies coverage or a duty to defend; and (4) common-fund cases.

*Society, 421 U.S., [240] at 257–58, 95 S.Ct. [1612], at 1621–22, 44 L.Ed.2d 141.* The doctrine rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense. See, *e.g., Mills v. Electric Auto–Lite Co., 396 U.S. at 392, 90 S.Ct. [616] at 625.* Jurisdiction over the fund involved in the litigation allows a court to prevent this inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefitted by the suit. See *id.,* at 394, 90 S.Ct. at 626. *Id.* at 478, 100 S.Ct. 745.

■■■ The Supreme Court pointed out in *Mills, supra,* that the common-fund doctrine is primarily a "judicially-created exception ... where a plaintiff has successfully maintained a suit, usually on behalf of a class that benefits a group of others in the same manner as himself." 396 U.S. at 392, 90 S.Ct. 616. Because the common-fund doctrine is an equity-based judicially-created exception, it follows that the application of the doctrine is vested within the discretion of the trial judge. The Supreme Court examined this notion in *Chambers v. NASCO, Inc.,* 501 U.S. 32, 111 S.Ct. 2123, 115 L.Ed.2d 27 (1991), when it wrote, "[T]he 'common fund exception,' derives not from a court's power to control litigants, but from its historic equity jurisdiction, and allows a court to award attorney's fees to a party whose litigation efforts directly benefit others." *Id.* at 45, 111 S.Ct. 2123 (citations omitted). The Court held that the trial court had not abused its discretion in awarding attorneys' fees. *Id.* at 50, 111 S.Ct. 2123.

■■■ Accordingly, the abuse of discretion standard is the appropriate standard of review. *Id.; see also Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162 (Del.1989). Maryland law holds likewise. *Rauch v. McCall,* 134 Md.App. 624, 638, 761 A.2d 76 (2000) ("The award of attorney's fees by the court is a 'factual matter which lies within the "sound discretion of the trial judge and will not be overturned unless clearly erroneous." ' ") (citations and quoting sources omitted), *cert. denied,* 362 Md. 625, 766 A.2d 148 (2001); *see also Milton Co.*

*v. Council of Unit Owners of Bentley Place Condos,* 121 Md.App. 100, 708 A.2d 1047 (1998), *aff'd,* 354 Md. 264, 729 A.2d 981 (1999).

 In Maryland, the common-fund doctrine is a clearly accepted exception to the American Rule, though it is infrequently invoked. In *Hess Constr. Co., supra,* 341 Md. 155, 669 A.2d 1352, the Court of Appeals, in an opinion authored by Judge Rodowsky, discussed the various instances in which the common-fund doctrine had been previously applied in reported cases in Maryland.

> The common fund theory has been applied or recognized where all of the holders of mortgage debentures were benefitted by the sale of the security, ordered over the objection of receivers for the debtor corporation, *Terminal Freezing & Heating Co. v. Whitelock,* 120 Md. 408, 87 A. 820 (1913); where a stockholder's derivative action benefitted all of the shareholders, *Davis v. Gemmell,* 73 Md. 530, 21 A. 712 (1891); where all of the taxpayers of a municipality were benefitted by a taxpayer's action resulting in reimbursement to the municipality of unauthorized disbursements, *Bowling v. Brown,* 57 Md.App. 248, 469 A.2d 896 (1984); and where a successful taxpayer's action benefitted all taxpayers of a "special tax district." *Smith v. Edwards,* 46 Md.App. 452, 418 A.2d 1227 (1980), *rev'd on other grounds,* 292 Md. 60, 437 A.2d 221 (1981).

*Hess Constr. Co., supra,* 341 Md. at 168–69, 669 A.2d 1352. More recently, in *United Cable Television of Baltimore Ltd. P'ship v. Burch,* the Court of Appeals allowed recovery of common-fund attorneys' fees in a class action against a limited partnership, but ultimately reversed and remanded on the precise amount of fees. The fees must be considered "reasonable" under Rule 1.5(a) of the Maryland Rules of Professional Conduct. 354 Md. 658, 686–88, 732 A.2d 887 (1999), *superceded by statute on other grounds; see Plein v. Dep't of Labor, Licensing and Regulation,* 369 Md. 421, 800 A.2d 757 (2002).

### Derivative Actions Against Limited Partnerships

A Maryland statutory exception (among several) to the American Rule may be found in § 10–1004 of the Corps. & Ass'ns Article, wherein the Legislature has provided a fee-shifting provision for limited partners who successfully maintain a derivative action on behalf of the partnership.[12] This section provides:

> If a derivative action is successful, in whole or in part, or if anything is received by the plaintiff as a result of a judgment, compromise, or settlement of an action or claim, the court may award the plaintiff reasonable expenses, including reasonable attorney's fees, and shall direct him to remit to the limited partnership the remainder of those proceeds received by him.

Md.Code Ann., Corps. & Ass'ns § 10–1004 (Repl.Vol.1999).

### The Case *Sub Judice*

Following the submission of briefs by the parties, and a lengthy hearing, the trial court concluded, in part, as follows:

> *Plaintiff's Motion for Award of Fees and Costs Under the "Common–Fund" Doctrine*
>
> Defendants argue that [Garcia] should receive no fees or costs because there was no necessary predicate of a contract or statute authorizing payment of fees and costs. Defendants also argue that since recovery was had under the breach of contract claim, which was not pled in a derivative fashion, there can be no recovery of attorney's fees. See Corporation and Associations Article, Section 10–1001–1004.
>
> Plaintiff seeks an award of attorney's fees under the "common fund" exception doctrine which he argues is recognized in Maryland. See *Davis v. Gemmell,* 73 Md. 530, 21 A. 712; *Hess Construction Company v. Board of Education*

---

12. One form of action that a limited partner may bring against a limited partnership is a derivative action. *See* Md.Code Ann., Corps. & Ass'ns § 10–1001 (Repl.Vol.1999); *Provident Bank, supra,* 98 Md.App. at 612, 634 A.2d 973.

*of Prince George's County,* 341 Md. 155, 669 A.2d 1352; *United Cable Television of Baltimore Limited Partnership v. Burch,* 354 Md. 658, 732 A.2d 887; *Wittman v. Crooke,* 120 Md.App. 369, 707 A.2d 422; *Tandycrafts, Inc. v. Initio Partners,* 562 A.2d 1162 (Del.–1989).

The Court agrees with the underlying thesis of the Plaintiff's argument that the Plaintiff represented interests of all of the partners of F.P. Rockville Limited Partnership who received the benefits of his labor. Even though not pled as a derivative claim, the exact purpose of Corporation and Associates Article, Section 10–1001–1004 was accomplished. The judgment rendered in favor of F.P. Rockville Limited Partnership is the exact judgment that would have been rendered had the claim been made in a derivative fashion. Finally, there is nothing in Corporation and Associations Article 10–1004 that mandates that the common fund production prohibits an award of attorney's fees if the production is achieved through a direct action as opposed to [a] derivative claim. See also *Tandycrafts, Inc. v. Initio Partners,* Supra, at p. 1166, ("There is no class action or derivative suit prerequisite to an award of attorney's fees under the common benefit exception.") Thus, the Court holds that F.P. Rockville Limited Partnership should be required to compensate the Plaintiff with an award of a portion of the attorney's fees and costs he incurred.

Attorney's fees awarded pursuant to the common fund doctrine may be calculated using either a percentage of the recovered benefit, the Lodestar approach (i.e., a calculation of the attorney's reasonable hours multiplied by a reasonable hourly rate), or a combination of both. See *United Cable Television of Baltimore Limited Partnership v. Burch,* Supra, at p. 685–688, 732 A.2d 887.

The Court rejects the percentage method because of the arbitrariness of picking a fair percentage. Rather the Court calculates the fee under the Lodestar approach.

Plaintiff's suit sought two things: the recovery of the development fee, and the award of a direct ownership interest in Rockville Metro. The Plaintiff, for the benefit of

the partnership, prevailed in the first and lost on the second. Plaintiff supports his requested attorney's fees by Affidavit of Donald Clark, Jr., Esquire, as to the reasonableness of the hourly rate and work done. Mr. Clark's background and experience, as set forth in the Affidavit, provides the necessary expertise. See *Kirsner v. Edelmann,* 65 Md.App. 185, 499 A.2d 1313.

The Affidavit of Plaintiff's chief counsel, David Clark, Jr., Esquire, reflects that no time or services were charged where they related "solely" to the claim for an ownership interest. However, one-third of the time and services (marked "C") where charged for those items "related predominantly to the claim for ownership services". The Court believes that since the Plaintiff did not prevail on the claim and it was not "reasonably related" to the other claims, all time and services related to the claim for an ownership interest should be deducted. Accordingly, there is a downward deduction of the fee sought of $140,000.00 by $11,835.00 (1/3 of $35,514.25, those items marked "C").

Fougler Pratt contends that the trial court erred by granting Garcia's requested attorney fees under § 10–1004, because his breach of contract claim was not a derivative action. Garcia, on the other hand, argues that the court awarded the fees under the common-fund doctrine, and that under Maryland law it was appropriate to do so.

We read the trial court's opinion as granting the attorneys' fees based on the common-fund doctrine. That said, however, we think that the trial court found analogous support for its position from § 10–1004, and therefore chose to include this as a rationale in its written opinion. The trial court determined that if Garcia had brought his claim as a derivative action he would have been likewise entitled to fees. Nevertheless, we still must review the propriety of the court's action, given Foulger–Pratt's broad challenge.

Again, we are faced with a mixed question of law and fact with corresponding standards of review. *See Gregg Neck Yacht Club, supra,* 137 Md.App. at 751–52, 769 A.2d 982.

Initially, as a matter of law, we must determine whether Garcia was entitled to attorneys' fees under the common-fund exception. Second, if the common-fund doctrine is applicable, we must, as a matter of fact, review whether the court erred in calculating the amount and reasonableness of the fee award under that doctrine; more specifically, whether the court abused its discretion in awarding Garcia fees associated with unsuccessful claims that were related to his successful claim. We will address point each in turn.

## The Common–Fund Doctrine's Applicability to this Case

Foulger–Pratt makes several arguments as to why Garcia was not entitled to fees, including that Maryland has never applied the common-fund doctrine to limited partners in a partnership. In this regard, Fougler Pratt posits that § 10–1004 is only applicable to derivative actions, and further, that this section provides the only way a limited partner may recover attorneys' fees. Implicit in cross-appellant's argument is the position that the legislative language of § 10–1004 has abrogated the common law, such that adherence to § 10–1004 is the only possible vehicle for recovery of attorneys' fees. In other words, Foulger–Pratt posits that the legislature has provided the only mechanism in which a limited partner may recover fees as set forth in § 10–1004.

Garcia argues that § 10–1004 has not abrogated the common law "common-fund doctrine," and rests most of his support on *Davis v. Gemmell*, 73 Md. 530, 21 A. 712 (1891) (cited in *Hess Constr. Co., supra*, 341 Md. at 168, 669 A.2d 1352). The facts of *Davis* are lengthy, but worthy of discussion.

In *Davis*, three shareholders were the sole owners of the North Branch Company, a corporation. *Id.* at 532, 21 A. 712. William A. Brydon was the majority owner; the minority owners were Thomas Gemmell and Malcolm Sinclair. Brydon recovered a $75,000 judgment against the Ohio Railroad Company for breach of contract. *Id.* at 532, 21 A. 712. The court awarded the judgment to an assignee of Brydon (Henry G. Davis and Company). *Id.* Following this, the two minority

shareholders (Gemmell and Sinclair) brought suit against the majority shareholder (Brydon) alleging that he had misappropriated the $75,000 judgment, in that it properly enured to the North Branch Company. The trial court agreed with the minority shareholders and held "that the judgment, though recovered in Brydon's name, belonged in fact to the North Branch Company...." *Id.* at 535, 21 A. 712. The Court of Appeals affirmed, and in so doing directed that the attorneys' fees of the two minority shareholders be paid out of the fund. The Court of Appeals found that "[t]heir labor resulted in preserving the fund for the North Branch Company, and ... the sum which should be audited to them upon a *quantum meruit* is fourteen thousand dollars." *Id.* at 540, 21 A. 712. "[T]he fee was allowed upon the theory that counsel for Gemmell and Sinclair in fact represented the interest of all the stockholders, who received the fruits of their labor." *Terminal Freezing & Heating, supra,* 120 Md. at 417, 87 A. 820 (summarizing the holding in *Davis*).

■■■ We agree with Garcia. Contrary to Foulger–Pratt's position, we find nothing in § 10–1004 which suggests that the legislature intended to abrogate the common law award of attorneys' fees in cases involving limited partnerships. Section 10–1004 does not explicitly restrict the application of the common law exceptions to the American Rule, and from a statutory construction perspective, "there is a presumption against statutory preemption of the common law[,]" unless there is express language to suggest otherwise. *Hardy v. State,* 301 Md. 124, 131, 482 A.2d 474 (1984); *see also Mills, supra,* 396 U.S. at 390–92, 90 S.Ct. 616.

Moreover, we find *Davis* as persuasive authority supporting Garcia's position that attorneys representing limited partners in a limited partnership may receive their fees from a common fund recovered as a result of their efforts. Indeed, the underlying basis for the attorneys' fees in *Davis* was that the attorneys for the minority interests had recovered the $75,000 judgment for the benefit of all three interested parties; even when one of the three interested parties had previously

wrongfully diverted the award so that the recovery to the common fund was actually a detriment to him. The mere fact that *Davis* dealt with three "shareholders" versus three "partners" is not, in our view, a compelling reason for barring the use of the common-fund doctrine to the present case. We find the underlying principle espoused in *Davis* equally applicable to this case.

[19, 20] Foulger–Pratt further maintains that the common-fund doctrine is inapplicable to this case, because there is no "group" or "class" of benefitted persons. Foulger–Pratt states that "every Maryland case that has ever addressed a common fund exception to the American Rule has involved a class action, a corporate shareholders derivative action, or a similarly large and widely dispersed group of beneficiaries such as taxpayers or bondholder." *See, e.g., United Cable Television of Baltimore Ltd. P'ship, supra,* 354 Md. 658, 732 A.2d 887; *Davis, supra,* 73 Md. 530, 21 A. 712; *Bowling, supra,* 57 Md.App. 248, 469 A.2d 896; *Terminal Freezing & Heating, supra,* 120 Md. 408, 87 A. 820. Aside from the fact that *Davis* directly involved only three interested parties (as here), we find nothing in the Maryland cases to suggest a threshold number of persons to whom the benefit must accrue. As noted above, the common-fund doctrine is equity-based, and its application left to the discretion of the trial judge. Indeed, the U.S. Supreme Court, in *Sprague v. Ticonic Nat'l Bank,* 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184 (1939), held that even one person bringing suit on behalf of herself may be entitled to fees in a common-fund case. The Court upheld the trial court's authority to grant attorneys' fees to a petitioner who had sued on her own behalf, because of the *stare decisis* impact of the decision. *Id.* at 166–67, 59 S.Ct. 777. The Court wrote:

> That the party in a situation like the present neither purported to sue for a class nor formally established by litigation a fund available to the class, does not seem to be a differentiating factor so far as it affects the source of the recognized power of equity to grant reimbursements of the kind for which the petitioner in this case appealed to the

chancellor's discretion. Plainly the foundation for the historic practice of granting reimbursement for the costs of litigation other than the conventional taxable costs is part of the original authority of the chancellor to do equity in a particular situation. Whether one professes to sue representatively or formally makes a fund available for others may, of course, be a relevant circumstance in making the fund liable for his costs in producing it. But when such a fund is for all practical purposes created for the benefit of others, the formalities of the litigation—the absence of an allowed class suit or the creation of a fund, as it were, through *stare decisis* rather than through a decree—hardly touch the power of equity in doing justice as between a party and the beneficiaries of his litigation. As in much else that pertains to equitable jurisdiction, individualization in the exercise of a discretionary power will alone retain equity as a living system and save it from sterility.

*Id.* at 166–67, 59 S.Ct. 777 (footnote omitted).

In a related argument, Foulger–Pratt also argues, as a matter of fact, that Garcia was the only person to benefit from the recovery of the $934,000 development fee to the partnership, and so the common-fund doctrine is inapplicable. This simply is not correct. Pursuant to Paragraph 5.2.2(i) of the Rockville Metro Plaza Operating Agreement, the Partnership was entitled to the $934,000 development fee. As previously explained, the Partnership is composed of (1) Foulger Investments, Inc. (the general partner) with a 2% equity interest, (2) FP Investments, LLC, (the other limited partner) with an 88% equity interest, and (3) Garcia with a 10% equity interest. Rockville Metro Plaza initially began paying the development fee to Foulger–Pratt Development, Inc., an entirely separate legal entity. Because of Garcia's efforts, Foulger Investments, Inc., and FP Investments LLC, will now recover a benefit that would not have otherwise materialized. Notably, the other limited partner (FP Investments) has an approximate $822,000 interest in the recovered development fee due, in whole, to Garcia's efforts.

On its face, clearly it cannot be claimed that the other legal entities comprising the partnership did not benefit. As we previously commented, the United States Supreme Court has noted that the common-fund doctrine "rests on the perception that persons who obtain the benefit of a lawsuit without contributing to its cost are unjustly enriched at the successful litigant's expense." *Boeing Co., supra,* 444 U.S. at 478, 100 S.Ct. 745. If Garcia was not entitled to pay his attorneys' funds out of the common fund, Foulger Investments, Inc., and FP Investments LLC, would reap the fruit of his labor, without sharing any of the costs. In summary, Garcia did not recover the $934,000 personally, rather, he recovered the benefit on behalf of the entire partnership.[13]

### Recovery of Fees for Unsuccessful Claims Related to the Successful Claim

Having established as a matter of law that the common-fund doctrine was applicable to the case *sub judice,* we must now focus our attention on whether the court abused its discretion in calculating the amount and reasonableness of the fee awarded. As the question suggests, we review a court's establishment of a "reasonable" fee under an abuse of discretion standard. *Rauch, supra,* 134 Md.App. at 639, 761 A.2d 76. The crux of the issue for this case is whether Garcia's counsel is entitled to fees associated with work done for the unsuccessful claims related to the successful claim.

Foulger–Pratt argues that the trial court erred by awarding Garcia fees for the unsuccessful claims of conversion and breach of fiduciary duty. Garcia responds by pointing out that those claims were "reasonably related" to his successful breach of contract claim.

On this issue, the trial court held:

---

13. Garcia also argued before the trial court that the Partnership had a number of creditors who might be considered as benefitted group members, such as in *Davis, supra,* 73 Md. 530, 21 A. 712. Foulger–Pratt claims that Garcia's evidence about other creditors is anecdotal or speculative.

Finally, [Garcia] seeks fees for the unsuccessful claims (conversion and breach of fiduciary duty) reasonably related to the claim in obtaining the development fee for the partnership. Plaintiff urges the adoption of the analogy in *Continental Casualty Company v. Board of Education of Charles County*, 302 Md. 516, 489 A.2d 536, because the tort actions of conversion and breach of fiduciary duty were based on the same facts as the Plaintiff's cause of action for breach of contract. The Plaintiff argues that the Defendant's defense took the position that it was not conversion because it was a contract claim. It was not breach of contract because the contract did not prohibit what happened. It was not breach of fiduciary duty, because it was a breach of contract claim—and around we go again. As Plaintiff notes, because claims were asserted under alternative related causes of action, he should not be penalized for "good advocacy" as long as one claim[ ] provides him with the recovery he seeks. See *Hensley v. Eckerhart*, 461 U.S. 424, [440–41,] 103 S.Ct. 1933, 1943, 76 L.Ed.2d 40.

The Court agrees with the analogy and adopts the "reasonably related" argument. Nevertheless, there was one claim (misrepresentation) that was not successful nor reasonably related to the same facts. If the total fee for the four claims (breach of contract, conversion, breach of fiduciary duty, and misrepresentation) is $128,000 ($140,000.00 minus $11,835.00), the Court apportions $32,000.00 to each claim (1/4 of $128,000.00). Since misrepresentation was neither successful nor reasonably related, a downward deduction of $32,000.00 is appropriate in determining the reasonableness of the total fee after considering and applying the factors set forth in the Maryland Code of Professional Responsibility with respect to attorney's fees. See Rule 1.5(a), Maryland Rules of Professional Conduct.

 Very recently, in *Friolo v. Frankel*, 373 Md. 501, 819 A.2d 354 (2003), the Court of Appeals had the opportunity to address the proper amount of attorneys' fees when a plaintiff is only partially successful. In *Friolo*, the Court was called on to consider whether a trial court is required to use the

"lodestar" approach under all Maryland fee-shifting statutes. *Id.* at 504, 819 A.2d 354.[14] In concluding that the lodestar approach is "ordinarily the appropriate" method to use, the Court relied extensively on the Supreme Court's opinion in *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983), a case focused on whether "prevailing plaintiffs could recover fees for legal services related to unsuccessful claims." *Friolo, supra,* 373 Md. at 523–25, 819 A.2d 354. In *Hensley,* the Supreme Court held that

> the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees under 42 USC § 1988 [i.e., a fee-shifting statute]. Where the plaintiff has failed to prevail on a claim that is distinct in all respects from his successful claims, the hours spent on the unsuccessful claim should be excluded in considering the amount of a reasonable fee. Where a lawsuit consists of related claims, a plaintiff who has won substantial relief should not have his attorney's fee reduced simply because the district court did not adopt each contention raised. But where the plaintiff achieved only limited success, the district court should award only that amount of fees that is reasonable in relation to the results obtained.

*Id.* at 440, 103 S.Ct. 1933.

 Judge Wilner, writing for the Court in *Friolo,* adopted the analysis set forth in *Hensley* for awarding fees to partially successful litigants. *Friolo, supra,* 373 Md. at 523–25, 819 A.2d 354. The key inquiry, therefore, is the degree of success achieved by the plaintiff. *Id.* at 525, 819 A.2d 354. For example, if a "plaintiff has obtained 'excellent results,' the attorney should recover 'a fully compensatory fee.' " *Id.* at 524–25, 819 A.2d 354 (citing *Hensley, supra,* 461 U.S. at 435, 103 S.Ct. 1933). "Conversely, if the plaintiff has achieved

---

**14.** The "lodestar" approach calculates the attorneys' fees "by multiplying the reasonable number of hours expended by the attorney on the litigation by a reasonable hourly rate and then to consider appropriate adjustments to the product of that multiplication." *Id.* at 504, 819 A.2d 354.

'only partial or limited success,' the product of hours reasonably spent on the litigation times the hourly rate 'may be an excessive amount,' even where the 'claims were interrelated, nonfrivolous, and raised in good faith.'" *Id.* at 525 (citing *Hensley, supra,* 461 U.S. at 436, 103 S.Ct. 1933).

Although *Friolo* applied to all Maryland fee-shifting statutes, rather than the common-fund doctrine, we see no reason to depart from the *Friolo* analysis, because in both types of cases there is an underlying equity/policy basis for shifting the fee burden. Of course, the *Friolo* analysis "relates to how the lodestar approach is to be implemented[,]" *id.* at 525, 819 A.2d 354, application of which, as we have noted, is vested within the discretion of the trial judge to ensure a reasonable fee. A judge applying the lodestar approach must also look to a variety of factors established in the caselaw, *see Friolo, supra,* 373 Md. at 521–522 and n. 2, 819 A.2d 354 (citing *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–19 (5th Cir.1974)), and under Rule 1.5(a) of the Maryland Rules of Professional Conduct to ensure the fees were "reasonable." *Friolo, supra,* 373 Md. at 527, 819 A.2d 354.

■ In this case, Garcia's lawyers' accrued $271,618.50 in total fees, $257,344.25 of which was entirely attributed to work by attorneys (and paralegals). Garcia sought $140,000 in attorneys' fees by including all the fees associated with the recovery of the development fee, 1/3 of the fees "related predominantly to the claim for the ownership interest[,]" none of the fees related solely to the ownership interest, and "two thirds of remaining entries were included in the requested figure[.]" Disbursements were calculated in the same fashion. From the start, therefore, we know that Garcia conceded that he was not entitled to the total fees. To use the words of *Friolo,* he had not achieved "excellent results." Accordingly, we have no need to determine whether all of his fees were fully compensatory.

Upon reviewing the record as a whole, and the court's extensive memorandum on the issue, we find no abuse of

discretion in the court's calculation of the amount and reasonableness of the fee award. The court had before it an extensive line-by-line accounting of all the fees generated pursuant to each claim, and had the opportunity to review that document before making its determination. The court found that Garcia had partially succeeded, and granted fees for the prevailing claim and those fees reasonably related to that claim,[15] but denied Garcia's request for 1/3 of the time and services "related predominantly" to the ownership interest because Garcia did not prevail on that claim. The trial court also denied all fees on the misrepresentation count as it "was neither successful nor reasonably related...." The court's approach was entirely consistent with *Friolo, supra,* 373 Md. 501, 819 A.2d 354, and *Hensley, supra,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40.[16] Furthermore, the court's use of the lodestar approach instead of the percentage method was clearly justified, *see Burch, supra,* 354 Md. at 686, 732 A.2d 887; *Friolo, supra,* 373 Md. 501, 819 A.2d 354, and the court relied on the factors set forth in Rule 1.5(a) of the Maryland Rules of Professional Conduct to ensure a reasonable fee award. In short, the court awarded Garcia only about 1/3 of the total fees generated by his attorneys, and roughly 2/3 of the requested fees. Based on the foregoing, we hold that the trial court did not abuse its discretion, or otherwise err, in calculating the amount or reasonableness of the attorneys' fees awarded to the prevailing party, Garcia.

---

**15.** Prior to Garcia's second amended complaint (i.e., nine out of the ten months that litigation had been pending), return of the development fee and a 5% direct interest were the only relief sought by Garcia. All said, one-half of Garcia's claims (conversion, breach of contract, breach of fiduciary duty) sought the return of the $934,000 development fee, in which he succeeded in recovering.

**16.** In light of the notion that this Court may affirm a trial court if it is right, even for the wrong reason, because the court's determination was consistent with *Friolo* and *Hensley,* we have no need to address whether the court's reliance on *Continental Cas. v. Bd. of Ed. of Charles County,* 302 Md. 516, 489 A.2d 536 (1985), was erroneous. *See Hurt v. Chavis,* 128 Md.App. 626, 640, 739 A.2d 924 (1999).

## II. Whether the trial court abused its discretion, or otherwise erred, when it denied Foulger–Pratt's request for attorneys' fees under Maryland Rule 1–341?

Foulger–Pratt also sought fees pursuant to Md. Rule 1–341. Foulger–Pratt's attorneys' accrued $255,869.09 in total fees (disbursements comprising $10,456.59 of the total) and sought recovery for all fees in the case.

### Rule 1–341

Maryland Rule 1–341 (2002) provides in full:

> In any civil action, if the court finds that the conduct of any party in maintaining or defending any proceeding was in bad faith or without substantial justification the court may require the offending party or the attorney advising the conduct or both of them to pay to the adverse party the costs of the proceeding and the reasonable expenses, including reasonable attorney's fees, incurred by the adverse party in opposing it.

Maryland courts employ a two-step process to determine if sanctions under the rule are warranted. *Barnes v. Rosenthal Toyota, Inc.,* 126 Md.App. 97, 105, 727 A.2d 431 (1999) (quoting and citing *Inlet Assocs. v. Harrison Inn Inlet, Inc.,* 324 Md. 254, 267–68, 596 A.2d 1049 (1991)); *see also Seney v. Seney,* 97 Md.App. 544, 549, 631 A.2d 139 (1993); PAUL V. NIEMEYER & LINDA M. SCHUETT, MARYLAND RULES COMMENTARY at 57 (3d. ed.2003). First, the court must determine if the party or attorney maintained or defended the action in bad faith or without substantial justification. *Id.* at 105. Bad faith, in the context of Rule 1–341, "exists when a party litigates with the purpose of intentional harassment or unreasonable delay." *Id.* (citing *Seney, supra,* 97 Md.App. at 554, 631 A.2d 139). "For there to be substantial justification, the litigant's position must be fairly debatable and within the realm of legitimate advocacy." *Id.* at 105–06 (citing *Inlet Assocs., supra,* 324 Md. at 268, 596 A.2d 1049). The action(s) must be viewed at the time it was taken,

not from judicial hindsight. *Legal Aid Bureau, Inc. v. Bishop's Garth Assocs. Ltd. P'ship*, 75 Md.App. 214, 221, 540 A.2d 1175 (1988), *cert. denied*, 313 Md. 611, 547 A.2d 188 (1988). A trial judge must be satisfied by a preponderance of the evidence that a party has acted in bad faith or without substantial justification. *Attorney Grievance Comm'n v. Alison*, 349 Md. 623, 635, 709 A.2d 1212 (1998). We review the court's first determination under a clearly erroneous standard. *Barnes, supra*, 126 Md.App. at 105, 727 A.2d 431; *see also* Md. Rule 8–131(c). Incidentally, we note that a motion under Rule 1–341 is also subject, itself, to scrutiny under the rule. *Hauswald Bakery v. Pantry Pride Enter., Inc.*, 78 Md.App. 495, 507 n. 3, 553 A.2d 1308 (1989).

██ Second, if a court finds a claim was pursued in bad faith or without substantial justification, it then has to determine whether to award sanctions. *Id.* Indeed, a court has the discretion to refuse sanctions, even if there is a finding of bad faith. *Bishop's Garth, supra*, 75 Md.App. at 222, 540 A.2d 1175; *see also* NIEMEYER & SCHUETT, *supra*, MARYLAND RULES COMMENTARY at 59. On appeal, we review the court's second determination under an abuse of discretion standard. *Id.* at 221; *Barnes, supra*, 126 Md.App. at 105, 727 A.2d 431.

In *Bishop's Garth, supra*, 75 Md.App. 214, 540 A.2d 1175, then Chief Judge Gilbert detailed the judicial hesitancy in awarding sanctions under Md. Rule 1–341. His oft-quoted words include the following:

> Maryland Rule 1–341 is not, and never was intended, to be used as a weapon to force persons who have a questionable or innovative cause to abandon it because of a fear of the imposition of sanctions. Rule 1–341 sanctions are judicially guided missiles pointed at those who proceed in the courts without any colorable right to do so. No one who avails himself or herself of the right to seek redress in a Maryland court of law should be punished merely for exercising that right.

*Id.* at 224, 540 A.2d 1175 (citation omitted); *see also Parler & Wobber v. Miles & Stockbridge,* 359 Md. 671, 706, 756 A.2d 526 (2000); *Seney, supra,* 97 Md.App. at 550, 631 A.2d 139.

Judicial restraint is especially appropriate when it comes to awarding attorneys' fees. *Id.* at 223, 540 A.2d 1175 ("Rule 1–341 represents a *limited* exception to the general rule that attorney's fees are not recoverable by one party from an opposing party [or counsel] .... ") (citation omitted) (emphasis in original). In *Barnes,* this Court noted that "An award of counsel fees to Rule 1–341 is an 'extraordinary remedy,' which should be exercised only in rare and exceptional cases." 126 Md.App. at 105, 727 A.2d 431 (citing *Black v. Fox Hills N. Cmty. Ass'n, Inc.,* 90 Md.App. 75, 83, 599 A.2d 1228 (1992)); *Seney, supra,* 97 Md.App. at 549–50, 631 A.2d 139.

### The Case *Sub Judice*

Following trial, Foulger–Pratt alleged that Garcia pursued claims for (1) conversion, (2) breach of fiduciary duty, (3) misrepresentation, and (4) punitive damages "without substantial justification."

The court disagreed and concluded as follows:

*Defendants' Motion for an Award of Attorney's Fees and Costs Under Maryland Rule 1–341*

The test under Maryland Rule 1–341 is whether the Plaintiff maintained "any proceeding" in "bad faith or without substantial justification". "The phrase 'in bad faith or without substantial justification' should not be interpreted to mean that an asserted legal position must prevail." See *Maryland Rules Commentary,* (Second Edition, 2000 Cumulative Supplement), at p. 25. The Motion points to Plaintiff's claims for conversion, breach of fiduciary duty, misrepresentation and punitive damages, all of which were decided in favor of the Defendants.

The Court denied Defendants' Pretrial Motion to Dismiss the Plaintiff's Conversion and Misrepresentation Claims.

Having preserved Plaintiff's right to present these claims at trial, the Court cannot decide the case was brought and pursued in bad faith and without substantial justification. See *Needle v. White, Mendel, Clarke & Hill,* 81 Md.App. 463, 479[, 568 A.2d 856] [1990].

With regards to the breach of fiduciary duty, prior to trial the Court dismissed the Plaintiff's breach of fiduciary duty claim, but noted "the law is unclear", at least to this member of the Bench. See *Hartlove v. Maryland School for Blind,* 111 Md.App. 310[, 681 A.2d 584] [1996]; *Kann v. Kann,* 344 Md. 689[, 690 A.2d 509] [1997]; *Bresnahan v. Bresnahan,* 115 Md.App. 226[, 693 A.2d 1] [1997]; *Insurance Company of North America v. Miller,* 362 Md. 361[, 765 A.2d 587] [2001]; *Geduldig v. Posner,* 129 Md.App. 490[, 743 A.2d 247] [1999]; *Lyon v. Campbell,* 120 Md.App. 412[, 707 A.2d 850] [1998]. Whether clear or unclear, the Court believes the assertion of the cause of action was "fairly debatable" and not subject to a Rule 1–341 motion. See *Newman v. Reilly,* 314 Md. 364[, 550 A.2d 959] [1988].

While the Court dismissed Plaintiff's claim for punitive damages, the Court agrees with the Plaintiff's argument that whether the Plaintiff pled facts which warranted an inference of malice is "fairly debatable". The determination is to be made at the time the action was taken and not from the "vantage point of judicial hindsight". See *Henderson v. Maryland National Bank,* 278 Md. 514[, 366 A.2d 1] [1976].

Reading the court's memorandum opinion, we learn that the court did not reach the second-step inquiry. In short, it found Garcia had not acted "without substantial justification" in pursing his claims of conversion, breach of fiduciary duty, misrepresentation and punitive damages, so there was no need to exercise its discretion in choosing a sanction. Accordingly, we need only review the court's factual findings under a clearly erroneous standard. *Barnes, supra,* 126 Md.App. at 105, 727 A.2d 431.

## Conversion

Foulger–Pratt generically alleges that Garcia's claim had no basis under Maryland law, and therefore it was brought

"without substantial justification." [17] Garcia filed the conversion claim for recovery of the $934,000 development fee, and argues that the conversion theory was an alternate, but viable, theory to recover the fee, and that the court recognized as much.

We agree with Garcia. Simply because a party misconceives a legal basis for recovery does not mean that a claim proceeded "without substantial justification." *Century I Condo. Ass'n, Inc. v. Plaza Condo. Joint Venture*, 64 Md.App. 107, 119, 494 A.2d 713 (1985). Nor should a litigant " 'be penalized for innovation or exploration beyond existing legal horizons unless such exploration is frivolous.' " *Id.* at 119, 494 A.2d 713 (quoting *Dent v. Simmons*, 61 Md.App. 122, 128, 485 A.2d 270 (1985)). Moreover, in this case, the trial court had previously denied Foulger–Pratt's motion to dismiss the conversion claim. *Needle, supra*, 81 Md.App. at 479, 568 A.2d 856 ("The denial of the motion, furthermore, establishes that the court recognized that there were disputed questions of fact presented by the pleadings that precluded the court from granting [the] motion as a matter of law."). Upon our independent review of the record, we are unable to find the court's factual findings clearly erroneous.

---

**17.** Foulger–Pratt argues that Garcia "through his appeal continues to persist, in pursuing [this] cause of action. As a result, Defendants . . . continue to incur substantial costs and fees having to defend a claim that plainly lacked substantial justification." This is absolutely incorrect. Garcia made clear in his appeal that he was not appealing the conversion ruling, nor several other claims for that matter. Garcia wrote the following:

Mr. Garcia does not intend to pursue his appeal from the Circuit Court's rulings dismissing or denying his breach of contract claim relating to the general partner's refusal to provide him with timely access to the Partnership's tax information and other records, his claims for conversion, breach of fiduciary duty and misrepresentation and his request for punitive damages. To the extent, however, that the defendants argue in their appeal that those claims were frivolous or asserted in bad faith, Mr. Garcia respectfully reserves his right to argue their merit in his opposition to the defendants' appeal.

### Breach of Fiduciary Duty

Prior to trial, the court granted Foulger–Pratt's motion to dismiss the breach of fiduciary duty count, stating:

THE COURT: All right. [FOULGER PRATT'S COUNSEL], on breach of fiduciary duty motion to dismiss, let's take that, and the misrepresentation.

I don't need to hear from you on the breach of fiduciary duty. I will listen to [GARCIA'S COUNSEL] on that. Why don't I do that, and then we will go to the misrepresentation.

[GARCIA'S COUNSEL], I am faced with this day in and day out. I mean, everybody comes in with these same arguments back and forth, the same cases, and I have looked at the law.

You see these Court of Special Appeals cases that follow Kahn v. Kahn, and they talk about breach of fiduciary duty, but when you go back to it, and you look at some of the federal cases, it is just not clear guidance to trial courts as to what you do in this situation, but having said all that, it seems to me that the arguments favor the defense on the breach of fiduciary duty, that in view of the fact that you have these other claims, conversion, more importantly the breach of contract claim, that the breach of fiduciary duty is out the window.

\* \* \*

THE COURT: All right. As the Court indicated, the law is unclear because we are dealing with the Court of Appeals and the Court of Special Appeals in Maryland, but following the Kahn v. Kahn case line, the Court doesn't believe in this situation, since there is a cause of action set forth for breach of contract, albeit that there may be legitimate defenses to it one way or another—obviously I am not reaching anything close to even commenting on that, because I don't really know at this point—but the Court doesn't believe that under the factual scenario present in this case that there is, in view of the common holding, a breach of fiduciary duty, and accordingly the Court is going to grant the defendant's

motion to dismiss count III of the second amended complaint for breach of fiduciary duty.

Foulger–Pratt now argues that the "law *is* clear" in Maryland, that an independent cause of action for breach of fiduciary duty is not recognized if the allegations are duplicative of a breach of contract claim. (Emphasis added by Foulger–Pratt). Foulger–Pratt bases its claim on *Kann v. Kann*, 344 Md. 689, 690 A.2d 509 (1997), and several cases before this Court citing *Kann*. In *Kann*, the Court held "that there is no universal or omnibus tort for the redress of breach of fiduciary duty by any and all fiduciaries." *Id.* at 713, 690 A.2d 509. Were this all the Court of Appeals wrote on the subject, we might agree with Foulger–Pratt. The Court, however, further wrote:

> *This does not mean that there is no claim or cause of action available for breach of fiduciary duty. Our holding means that identifying a breach of fiduciary duty will be the beginning of the analysis, and not its conclusion.* Counsel are required to identify the particular fiduciary relationship involved, identify how it was breached, consider the remedies available, and select those remedies appropriate to the client's problem.

*Id.* at 713, 690 A.2d 509 (emphasis added).

Contrary to Foulger–Pratt's position, we do not find the Court's holding dispositive regarding the survival of an independent tortious fiduciary duty claim when a breach of contract claim is likewise brought; rather the Court of Appeals held that the analysis must be done on a case-by-case basis. *Id.* at 713, 690 A.2d 509. For example, following *Kann*, the Court of Appeals recognized breach of fiduciary duty as a viable cause of action in *Insurance Co. of N. Am. v. Miller*, 362 Md. 361, 765 A.2d 587 (2001) (upholding fiduciary duty claim brought by insurers against agent representing insurers).

Moreover, the trial court found that Garcia's assertion of the claim was "fairly debatable," thus quelling any notion that Rule 1–341 would apply. We agree with that conclusion, and

are unable to find the factual predicate supporting that conclusion to be clearly erroneous.

## Negligent Misrepresentation

The misrepresentation claim, like the conversion claim, survived Foulger–Pratt's motion to dismiss and was heard on the merits. On this alone, we would agree with the court's unwillingness to find an absence of substantial justification under Md. Rule 1–341. *Needle, supra*, 81 Md.App. at 479, 568 A.2d 856.

 The misrepresentation claim surfaced after Foulger–Pratt's attorneys, acting as agents of their client, made certain communications to Garcia about a "draft" tax return, and amendments to the Operating Agreement involving payment of the development fee. Foulger–Pratt argues that there were no false statements in those communications and thus, no cause of action under Maryland law.[18]

 We cannot agree with Foulger–Pratt's conclusion. When the misrepresentation claim is viewed in light of the entire record, and the factual context available at the time, Garcia may be said to have a "fairly debatable" reason for filing and maintaining this claim. As we noted *supra*, Foulger–Pratt's counsel noted in his June 19, 2002, letter that its previous communications about the return of the development fee were "not completely accurate." Counsel also wrote, "You

---

**18.** The elements of negligent misrepresentation are:

1) The negligent assertion of a false statement by the defendant owing a duty of care to the plaintiff;

2) The intention of the defendant for the plaintiff to act or rely upon the negligent assertion;

3) The knowledge of the defendant that the plaintiff will probably rely upon the negligent assertion or statement which, if erroneous, will cause damage;

4) Justifiable action by the plaintiff in reliance upon the statement or assertion; and

5) The incurring of damages caused by the defendant's negligence. PAUL M. SANDLER & JAMES K. ARCHIBALD, PLEADING CAUSES OF ACTION IN MARYLAND § 3.29, at 222–23 (2d. ed.1998) (citing *Gross v. Sussex, Inc.*, 332 Md. 247, 630 A.2d 1156 (1993)).

may then want to 'reinstate' those claims which were amended out because of the wording of my letter, which of course will not be opposed." Moreover, even though Foulger–Pratt had turned over a "draft" tax form to Garcia, Foulger–Pratt's chief financial officer admitted at trial that the form was incorrect. We reiterate that under Md. Rule 1–341 a party's action is viewed at the time it took place, not with the benefit of judicial hindsight. *Bishop's Garth,* 75 Md.App. at 221, 540 A.2d 1175. Furthermore, simply because a party does not prevail at trial does not necessitate a finding that a claim was brought in bad faith or without substantial justification. Otherwise, every losing party could be subject to sanctions under Md. Rule 1–341. Rather, this court's jurisprudence makes clear that "Maryland Rule 1–341 is not, and never was intended, to be used as a weapon to force persons who have a questionable or innovative cause to abandon it because of a fear of the imposition of sanctions." *Bishop's Garth, supra,* 75 Md.App. at 224, 540 A.2d 1175.

## Punitive Damages

Foulger–Pratt argues that Garcia did not have a fairly debatable reason for filing a punitive damage claim. Garcia filed the punitive damage claim because of the

> defendants' repeated, persistent, wanton and cavalier disregard for Garcia's rights under the Agreement of Limited Partnership—including the defendants' failure to take even basic steps to provide Garcia with accurate statements of fact concerning matters critical to this litigation—must be the result of a conscious desire to punish Garcia for having had the temerity to insist on receiving what he is entitled under the parties' agreements.

The parties have evidently zeroed in on the misrepresentation claim as the foundation for the punitive damage claim.

■■■■■■■■ Punitive damages, as the term suggests, seek to punish a party "whose conduct is characterized by evil motive, intent to injure, or fraud, and to warn others contemplating similar conduct of the serious risk of monetary liability."

*Owens–Illinois, Inc. v. Zenobia,* 325 Md. 420, 454, 601 A.2d 633 (1992). Punishment and deterrence are the two main goals of punitive damages. *Id.* at 454, 601 A.2d 633. Recovery of punitive damages requires the presence of actual malice, that is "conduct characterized by evil motive, intent to injure, ill will, or fraud." *Id.* at 460, n. 20, 601 A.2d 633. A plaintiff must prove the actual malice by a standard of clear and convincing evidence in order to recover. *Le Marc's Mgmt. Corp. v. Valentin,* 349 Md. 645, 709 A.2d 1222 (1998). We note, however, a finding of actual malice may be inferred from circumstantial evidence. *McClung–Logan Equipment Co. v. Thomas,* 226 Md. 136, 148, 172 A.2d 494 (1961). "Malice, fraud, deceit and wrongful motive are oftenest inferred from acts and circumstantial evidence. They are seldom admitted and need not be proved by direct evidence." *Id.* (citations omitted). If a party files a claim for punitive damages in bad faith or without substantial justification, a court has the discretion to invoke the Rule 1–341 sanctions. *Nast v. Lockett,* 312 Md. 343, 371, 539 A.2d 1113 (1988), *overruled on other grounds, Owens–Illinois, supra,* 325 Md. 420, 601 A.2d 633.

The trial court determined, as a matter of fact, that the "inference of malice is 'fairly debatable[.' "] We are unable to find the court's determination clearly erroneous. While we agree that punitive damages were not warranted in this case, there were facts (with inferences therefrom), presented during certain phases of the litigation, suggesting an ill-will or improper motive. For example, during the redirect examination of Clayton Foulger, the resident agent of the Partnership, the following discussion took place about the development fee:

Q [GARCIA'S COUNSEL] In any event, the way you did it before you have now retroactively tried to change it, Mr. Garcia did not get either directly or indirectly, a penny of that $950,000, did he?

A [FOULGER] That's correct, that's correct.

\* \* \*

Q [GARCIA'S COUNSEL] So he gets the benefit only if you pay him ten percent of it, which is what he is asking for and what you are denying in this case?

A [FOULGER] Yes, that's right.

THE COURT: Maybe I am really thick, but I don't even understand why you would consider it. If it goes back into FP Rockville in a year, which your tax boys say to do, and you have said, "Okay," why would you even think about putting it out to FPDI, Foulger–Pratt Development, if it's going to mean taxes?

[FP'S COUNSEL]: Because of the lawsuit.

[GARCIA'S COUNSEL]: Because they don't want to share it with us. He would rather take $450,000 in taxes than to give us ten percent.

[FOULGER]: That's not correct, that's not correct.

THE COURT: Well, that is, in effect, what is happening.

[FOULGER]: No, that's not correct.

THE COURT: I mean, you are doing that solely because of this lawsuit? That is the reason you would do it?

[FOULGER]: Yes, I am.

THE COURT: Why?

[FOULGER]: Because if I gave up that right, right now, they would argue that we changed that amendment, we amended that, in response to their complaint. That's why. And then they would—they would—they would then say that it's conversion, and then they would claim that we misrepresented from the beginning. And that's why it was important for me to retain that right so that they couldn't claim that I had done this in response to their suit, and I have not done that. But, you are right; economically, it doesn't make sense. I agree with you. But I have retained that right.

Although Foulger explains a motive, lacking the element of ill-will, for the reason Foulger–Pratt Development, Inc. would have incurred the $450,000 tax liability, there is nonetheless another inference that the purpose was premised on actual

malice, as pointed out by Garcia's counsel. The court believed Foulger–Pratt's explanation, and hence it denied the punitive damage claim. For example, in the court's written opinion on the merits it wrote: "This Court has found that the general partner did divert the development fee that belonged to the partnership, but what is not clear from the evidence is why the diversion was initially accomplished." At the same time, however, the court recognized that inferences could made from the facts to suggest actual malice, and hence it denied Foulger–Pratt's request for fees.

In conclusion, we hold that the trial court did not abuse its discretion, or otherwise err in denying Foulger–Pratt attorneys' fees under Md. Rule 1–341.

**JUDGMENTS OF THE CIRCUIT COURT FOR MONT-GOMERY COUNTY AFFIRMED; EACH PARTY TO PAY ITS OWN COSTS.**